## THE NANKING.

(District Court, N. D. California, S. D. August 20, 1923.)

Nos. 17811, 17815, 17823, 17844.

1. **Admiralty ⬤⟳1—Constitutional grant of maritime jurisdiction to federal courts is flexible; "admiralty and maritime jurisdiction."**

The grant to the federal courts, by Const. art. 3, § 2, of jurisdiction over "all cases of admiralty and maritime jurisdiction," is not limited to matters which were then of maritime cognizance, but is flexible, and extends to all such matters as in the progress of the years and the development of sea-borne trade may fairly come within the terms employed.

[Ed. Note.—For other definitions, see Words and Phrases, Admiralty Jurisdiction.]

2. **Constitutional law ⬤⟳56—Congress has power to enlarge the scope of maritime jurisdiction.**

Congress has the constitutional power to enlarge the scope of the maritime jurisdiction.

---

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Admiralty ☞15—Ship Mortgage Act, conferring jurisdiction on courts of admiralty, held constitutional.**

Ship Mortgage Act, § 30, subsecs. K, L, M, which confer on courts of admiralty exclusive jurisdiction of suits to foreclose ship mortgages, to determine priority of conflicting liens, *held* constitutional.

4. **Shipping ☞31—Mortgage held not void for failure to comply with directory provisions of Ship Mortgage Act.**

The provision of Ship Mortgage Act, § 30, subsec. D (e), requiring indorsement on the ship's documents of provisions of the mortgage relating to other property included therein, are directory, and the failure to make such indorsement respecting other property pledged for the mortgage debt *held* not to render the mortgage void.

In Admiralty. Suit by the Shell Company of California against the American steamship Nanking, with consolidated causes. On exceptions to answers. Exceptions sustained.

McCutchen, Olney, Mannon & Greene, J. F. Resleure, Ira S. Lillick, Wilson & Wilson, Bell, Simmons & Creech, Nathan H. Frank, Irving H. Frank, C. H. Sooy, Goodfellow, Eells, Moore & Orrick, C. H. Connick, and J. C. Meyerstein, all of San Francisco, Cal., for libelants and interveners.

Sullivan & Sullivan and Theo. J. Roche, of San Francisco, Cal., for the Nanking.

Heller, Ehrman, White & McAuliffe and Pillsbury, Madison & Sutro, all of San Francisco, Cal., for Union Trust Co. of San Francisco.

PARTRIDGE, District Judge. In the matter of the Nanking, the case is before the court upon various exceptions to various answers and libels filed against the ship. During the course of the last few months, a very large number of intervening libels have been filed. Among them is the intervening libel of the Union Trust Company of San Francisco, which is the trustee under a certain mortgage upon this ship and also another vessel belonging to the same company. As additional security for the mortgage there were pledged certain shares of stock of one of these Chinese steamship companies.

The exceptions to the libels raise three questions: The first is that the so-called Ship Mortgage Act (41 Stat. 1000) is unconstitutional; the second is that, even if the act is constitutional, the mortgage which is attached to the intervening libel of the libelant Union Trust Company is void, in that it does not comply with the act; and then the United States of America, in addition, sets up that it has prior claims against the vessel in amount some $280,000, by virtue of certain fines levied upon the ship for illegal transportation of opium.

[1] It is apparent that the Ship Mortgage Act had two main purposes. The first was to keep abreast with modern methods of finance and the ever-increasing volume of our foreign commerce. The decision of the Supreme Court in The John Jay, 17 How. 399, 15 L. Ed. 95, was written in 1854. At that time ships were small and largely in private ownership. The opinion of Mr. Justice Wayne shows that the John Jay was sold for $6,000. It has already appeared from other proceedings in this case that the Nanking cost 500 times as much, and, as I remember it, being a vessel in the neighborhood of 6,000 tons, is not a large ship as things go now. It is likewise certain, I think, that the

disparity between the largest vessel afloat in 1854 and such a steamship as the Leviathan, for instance, would be almost as great. Necessarily, such huge sums are ordinarily beyond the capacity of any private fortune, and the forms of corporate finance become essential. Without the form of assembling funds afforded by deeds of trust and the sale of bonds, the financing of a great modern steamship company would be a sheer impossibility. That being so, can it be said that a contract is maritime by which a ship is financed for the immediate needs of a particular voyage, and nonmaritime when the purpose is to raise money necessary to permit her to make any voyage at all?

Supposing a corporation owns a fleet of great steamers, plying to all quarters of the world. Through the fall in charters, or what not, result of a general trade depression, they are unable to finance any voyage at all. Clearly, if money were advanced on a bottomry bond for the necessities of a particular voyage, the contract would be maritime, the vessel bound, and the jurisdiction in rem in admiralty would be complete. Nay, the maritime "privilege" or lien adopted from the civil law would import a tacit hypothecation of the ship from the mere furnishing of supplies to a specific vessel, a jus in re, which could be executed and divested only by a proceeding in rem in admiralty. Now, supposing, on the other hand, the owner borrows a large sum, by the issuance of bonds based upon a deed of trust of all the vessels. How is the contract any the less maritime? Surely the language of the Constitution, giving this court jurisdiction in "all cases in admiralty and maritime jurisdiction," is broad and general enough.

Is it not flexible enough, also, that the federal courts shall be able to keep in step with advancing civilization, and to do their part in fulfilling the splendid destiny of this republic upon the sea? That the law, as administered by courts of justice, must be a thing of growth, and keep pace with the ever-changing conditions of human affairs, is recognized by everybody. In the process of this development, however, the courts must be alert to see that the limitations placed by the Constitution upon legislation and judicial decision are not weakened in the slightest degree, and particularly that the powers reserved to the federal government are not extended beyond the language and reasonable intendment of the Constitution. This court should be as ready to decline jurisdiction, when Congress attempts to confer it beyond the constitutional reservations, as alert to assume and exercise it when it comes fairly within those reservations. But, before this court should declare an act of Congress void, it should be convinced beyond any doubt that the jurisdiction conferred cannot fairly and reasonably be brought within the four corners of the charter of our fundamental law.

In determining that question, of course, it is proper to inquire what was the state of jurisdiction at the time the Constitution was adopted. But does that mean that we are to shut our eyes to progress, or narrowly conclude that the far-sighted framers of that instrument could not have beheld the splendid vision of a nation lying fair from sea to sea, with a commerce that should be commensurate with its territorial extent? Surely not. The Constitution of the United States was an inspired document. Precise though its language may be, the words are alive, vital with the spirit of progress, and with the sublime quality

of everlasting youth. It is not too much to say that, if the time ever comes when the soul of that instrument shall be out of touch with the aspirations of mankind, then, and not till then, will civilization be in danger of perishing from the earth.

Did the framers of the Constitution mean, when they framed that section, and did the people of the 13 colonies understand, when they adopted it, that the jurisdiction should be limited to the matters which were then of maritime cognizance, either here or in England? Or was not the intent rather to give jurisdiction to the federal courts of all such matters as in the progress of the years and the development of sea-borne trade, might fairly come within the terms employed? The answer to these alternatives is found in the reasons why jurisdiction of maritime matters was reserved to the federal courts at all, to the exclusion of the tribunals of the various states.

Let us take the case of The Thomas Jefferson, 10 Wheat. 428, 6 L. Ed. 358. The matter concerned the wages of seamen. Judge Story held that the federal courts had no jurisdiction, because the services were rendered on waters above the ebb and flow of the tide. And why? Because in England there are practically no waters above the tidal influence which are navigable. A quarter of a century later, however, Chief Justice Taney wrote his opinion in The Genessee Chief, 12 How. 443, 13 L. Ed. 1058. The matter involved there was a collision on Lake Ontario. Since the decision in The Thomas Jefferson, Congress had enacted a statute extending the jurisdiction of this court to the Great Lakes, and thus the question was squarely presented as to whether or not the Congress had the power so to extend it. It was pointed out that the Supreme Court had already, in The Thomas Jefferson, declared that waters where there was no tide were not within the jurisdiction of the admiralty. Surely that was as solemn and binding a decision as The John Jay. But the court pointed out that conditions were changed. At the time of the adoption of the Constitution, there was no water-borne commerce except by sea, or the great tidal rivers. The steamboat had not come into use. But by 1851, when The Genessee Chief was decided, there had come into being a considerable commerce on the Mississippi and the Great Lakes, and steamers were in very general use. So Chief Justice Taney points out that the reason for the rule of The Thomas Jefferson no longer existed, and it would be too narrow a view of the Constitution to limit it to tidewater, when there was no real distinction between a ship on the Thames and one on the Mississippi, between one on the inlets of the sea in Scotland, within the ebb and flow of the tide, and the lakes of America, where there is no tide.

Then, again, in Fretz v. Bull, 12 How. 466, 13 L. Ed. 1068, this jurisdiction was specifically extended to the Mississippi above tidewater, and in The Magnolia, 20 How. 296, 15 L. Ed. 909, to the Alabama, a river whose navigable course is wholly within a single state. Judge Story, moreover, in his work on the Constitution, says that the word maritime was "doubtless" added "to guard against any narrow interpretation of the preceding word 'admiralty.'"

In Waring v. Clarke, 5 How. 457, 12 L. Ed. 226, Mr. Justice Wayne considered the question as to whether the jurisdiction of admiralty

extended to a collision on waters infra corpus comitatus. That jurisdiction was denied in England at the time the Constitution was adopted, but Judge Wayne pointed out that the meaning of the Constitution was not to be restricted to the state of the law in England, because the jurisdiction was much larger in the colonies, and points out that in all the debates in the constitutional convention as well as in the several states—

"there was but one opinion, * * * and that was the necessity to give a power to the United States to relieve them from the difficulties which had arisen from the exercise of admiralty jurisdiction by the states separately."

[2] And in answer to the contention the opinion contains this significant language:

"It would be a denial to Congress of all legislation upon the subject. It would make, for all time to come, without an amendment of the Constitution, that unalterable by any legislation of ours, which can at any time be changed by the Parliament of England—a limitation which never could have been meant, and cannot be inferred from the words, which extend the jurisdiction of the courts of the United States 'to all cases of admiralty and maritime jurisdiction.' "

And, indeed, the jurisdiction of admiralty in England on the subject of ship mortgages was changed in England by Statutes 3 and 4 Victoria, c. 65, as recognized in the opinion in The John Jay. Indeed, that opinion contains this significant language:

"Until that shall be done in the United States by Congress, the rule in this particular must continue in the admiralty courts of the United States, as it has been."

I consider this a clear recognition of the power of Congress to do this very thing. Now, take the case of repairs to a ship. In The Lottawanna, 21 Wall. 558, 22 L. Ed. 654, it was held that if the services were rendered in a foreign port, jurisdiction lay to enforce the lien in admiralty, but not so if they were to a domestic vessel in her home port. In that case there is a very vigorous dissenting opinion by Mr. Justice Clifford, which Mr. Hughes considers unanswerable.

Subsequently, however, this curious anomaly was corrected by an act of Congress (36 Stat. 604 [Comp. St. §§ 7783–7787]). This act was passed at the instance of the Maritime Law Association, composed of the most eminent specialists in the country. And no one doubts its constitutionality. But it is another clear case of a statute giving to admiralty jurisdiction of matters concerning which the Supreme Court had declared it had no jurisdiction. Moreover, the case of The Lottawanna, like the case of The John Jay, fully recognizes the power of Congress to introduce such changes in maritime law as are from time to time needed. The language there is this:

"But we must always remember that the court cannot make the law; it can only declare it. If, within its proper scope, any change is desired in its rules, other than those of procedure, it must be made by the legislative department. It cannot be supposed that the framers of the Constitution contemplated that the law should forever remain unalterable. Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed. The scope of the maritime law and that of commercial regulation are not coterminous, it is true; but the latter embraces much the largest portion of ground covered by the former. Under it

Congress has regulated the registry, enrollment, license, and nationality of ships and vessels; the method of recording bills of sale and mortgages thereon; the rights and duties of seamen; the limitations of the responsibility of shipowners for the negligence and misconduct of their captains and crews; and many other things of a character truly maritime. And with regard to the question now under consideration, namely, the rights of materialmen in reference to supplies and repairs furnished to a vessel in her home port, there does not seem to be any great reason to doubt that Congress might adopt a uniform rule for the whole country, though, of course, this will be a matter for consideration, should the question ever be directly presented for adjudication.

"On this subject the remarks of Mr. Justice Nelson, in delivering the opinion of the court in White's Bank v. Smith (which established the validity and effect of the act respecting the recording of mortgages on vessels in the custm house), are pertinent. He says: 'Ships or vessels of the United States are creatures of the legislation of Congress. None can be denominated such, or be entitled to the benefits or privileges thereof, except those registered or enrolled according to the Act of September 1, 1789, and those which, after the last day of March, 1793, shall be registered or enrolled in pursuance of the Act of December 31, 1792, and must be wholly owned by a citizen or citizens of the United States, and to be commanded by a citizen of the same.' * * * 'Congress having created, as it were, this species of property, and conferred upon it its chief value under the power given in the Constitution to regulate commerce, we perceive no reason for entertaining any serious doubt but that this power may be extended to the security and protection of the rights and title of all persons dealing therein. The judicial mind seems to have generally taken this direction.' This case was subsequently affirmed by Aldrich v. Ætna Company."

In Atlantic Transport Co. v. Imbrovek, 234 U. S. 62, 34 Sup. Ct. 735, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157, the Supreme Court approves The Lottawanna, on that subject, saying:

"We take it to be clear that the District Court sitting in admiralty was entitled to declare the applicable law in such a case, as it was within the power of Congress to modify that law."

Secondly, the evident purpose of the act is the very purpose why the framers of the Constitution bestowed exclusive jurisdiction in matters maritime upon the federal courts, namely, because those courts are better fitted, by reason of their national, rather than state, status, to interpret and enforce the law of nations, as distinct from merely local laws. In No. 80 of The Federalist is found this language:

"The most bigoted idolizers of state authority have not, thus far, shown a disposition to deny the national judiciary the cognizance of maritime causes. These so generally depend on the law of nations, and so commonly affect the rights of foreigners, that they fall within the considerations which are relative to the public peace."

In a very recent case, I have had to consider the capture of an American vessel by the British navy, and her condemnation as prize in the English Admiralty Court, and her subsequent release by the House of Lords. The Edna, 292 Fed. 640. In another case, now pending, I have to consider whether or not the matters involved are to be settled by the laws of Norway, or the laws of the United States. The Sinoaloa, 292 Fed. 640.

The confusion which arose from a divided jurisdiction is illustrated in this very case. Numerous libels are filed here against the Nanking —for supplies, for repairs, even a claim of the United States for fines

for the illegal transportation of opium, and other claims by the government for the maintenance and deportation of Chinese. There is the sharpest kind of conflict as to the respective rank of the liens claimed by these various libelants—both among themselves and as against the trustee under this mortgage. Supposing I decline jurisdiction of the deed of trust, and the trustee, or the bondholders, are driven hence into the state courts? Can those courts appoint a receiver, or a commissioner on foreclosure, and seize the ship out of the hands of the United States marshal? Can they determine the relative rank of the mortgages and the fines levied by the federal government? And what unseemly conflict might ensue if their decision and the judgment of this court should be at variance? Such a conflict, with varying fortunes, was indeed long waged in England, and many of the anomalies which exist in America are really the outcome of that struggle. Some of it is exhibited in this very question.

The Neptune, 3 Hag. Ad. 129, was decided in 1834. It recognized that admiralty was not competent to administer any law but its own, namely the civil law, the law maritime, and the law merchant, and declined jurisdiction of a ship mortgage. But Stat. 3 and 4 Victoria was enacted in 1840, and under that act it was held in The Fortitude, 3 Wm. Rob. 217, decided in 1843, that the jurisdiction was confined to the ship itself, being mortgaged. In 1854, however, the Merchants Ship Act (amended in 1862) was passed, and this further extension recognized in The Innessfallen, L. R. 1 A. & E. 72, decided in 1866. Then, in The Eastern Belle, 33 L. T. 214, decided in 1875, it was held that admiralty had jurisdiction in a suit by a mortgagee to release a ship seized by one who claimed to be a co-owner.

The Cathcart, L. R. 1 A. & E. 314, under St. 25 and 26 Victoria, c. 63—where a ship has been arrested under mortgage, the court will decide the equities between the parties, and consider, not only the registered documents, but all the transactions relative to the mortgage loan. Nor is this conflict at all a stranger to our own tribunals. A rather typical instance is The Royal Saxon, Fed. Cas. No. 17,093. That vessel had been seized under foreign attachment by the state court in Pennsylvania, and the question was whether the District Court could, non obstante such seizure and the possession of the sheriff, sell her out under libel. The language of the court here is likewise significant:

"Here," says the court, "the subject-matter of the controversy is the res itself. It passes into the custody of the court. All the world are parties; and the decree concludes all outstanding interests, because all are represented. Here they are marshaled in their order of title or privilege; and if there be conflicting claims either upon the distributable fund, or upon the residue, the court adjudicates between them, or refers the question to that forum, either at home or in foreign countries, which is most competent to examine it. It is an international court; its seal is recognized everywhere; and its decrees are executed wherever, throughout the world, there is a court of admiralty to appeal to. Its forms of proceeding are known among all maritime nations, and the title which passes under them is absolute, without conditions, discharged of all liabilities and liens."

In Insurance Co. v. Dunham, 11 Wall. 1, 20 L. Ed. 90, the Supreme Court, in holding that a libel in personam on a policy of marine insurance would lie in admiralty, takes exactly the same view of the

origin and scope of the jurisdiction in this country as was taken in The Royal Saxon, and quotes Lord Mansfield to the effect that it goes back to sources long anterior even to the civil law itself; and that it is not the law of any particular country, but the general law of nations—

"and which is founded on the broadest principles of equity and justice, deriving, however, much of its completeness and symmetry, as well as its modes of proceeding, from the civil law, and embracing, altogether, a system of regulations embodied and matured by the combined efforts of the most enlightened commercial nations of the world."

And can it be reasonably maintained that all this was not in the minds of the great men who framed the Constitution, and was never discussed while that instrument was before the several states? To them admiralty and maritime jurisdiction meant exactly the same thing as it meant to Lord Mansfield and Mr. Justice Bradley, namely, "not the law of any particular country, but the general law of nations." And it must have meant equally, that being the administration of the law of nations, it was subject to modification by the Congress wherever it was found in any country that a change was necessary to keep pace with advancing commerce and civilization.

[3] In reference to ship mortgages, the Parliament corrected the evil long before the Congress; but, because we lagged reluctant, must it be said that we must stand still forever, and hamper the development of our own sea-borne trade, because three-quarters of a century ago it was believed that a mortgage on a ship was not a maritime thing? What is there in the English Constitution (which is not a written document) which should be held to permit them to advance—something not in our own Constitution, and which compels us to stand still? I cannot think so; and I am therefore convinced that the statute is constitutional. I am further constrained to this belief by the language of the Supreme Court in U. S. v. Cornell Steamboat Co., 202 U. S. 194, 26 Sup. Ct. 651, 50 L. Ed. 987:

"Although courts of admiralty have no general equity jurisdiction, and cannot afford equitable relief in a direct proceeding for that purpose, they may apply equitable principles to subjects within their jurisdiction, and, in the distribution of proceeds in their possession or under their control, may give effect to equitable claims."

And in Andrews v. Wall, 3 How. 572, 11 L. Ed. 729, Judge Story, who certainly was never in favor of any undue extension of the jurisdiction of admiralty, says:

"There is another view of the matter, which does not displace, but adds great weight to, the preceding considerations. This is a case of proceeds rightfully in the possession and custody of the admiralty; and it would seem to be, and we are of opinion that it is, an inherent incident to the jurisdiction of that court to entertain supplemental suits by the parties in interest, to ascertain to whom those proceeds rightfully belong, and to deliver them over to the parties who establish the lawful ownership thereof. This is familiarly known and exercised in cases of the sales of ships to satisfy claims for seamen's wages, for bottomry bonds, for salvage services, and for supplies of materialmen, where, after satisfaction thereof, there remain what are technically called 'remnants and surpluses,' in the registry of the admiralty."

And in Pratt v. Reed, 19 How. 359, 15 L. Ed. 660, it was held that a mortgagee was entitled to the proceeds of a vessel seized under a libel for supplies.

These answers further set up that, although the purported mortgage or deed of trust includes property other than the vessel, to wit, 4,850 shares of the capital stock of the China Pacific Steamship Company, Limited, a corporation organized under and by virtue of the laws of Hong Kong, said purported mortgage does not contain any provisions for the separate discharge of such property by the payment of a specified portion of the mortgage indebtedness as required by subdivision (c) of subsection D of section 30 of said act of June 5, 1920 (41 Stat. 1001), in order for a mortgage to have a preferred status. It seems to me a sufficient answer to that that the mortgage does contain that very thing. The mortgage is attached to the intervening libel of the Trust Company, Exhibit A, page 36, and it does contain a provision for the release of these 4,850 shares of stock upon the payment of a specified sum of money.

[4] Next, that the provision of the mortgage was not and is not indorsed upon the vessels' documents, as required by subdivision (1), (c), (4), and (e) of subsection D of said section 30, in that, while said purported mortgage or deed of trust included property other than the vessels, to wit, 4,850 shares of the capital stock of China Pacific Steamship Company, Limited, etc., no indorsement was made upon the vessels' documents of a specified portion of the mortgage indebtedness. I would be loath, indeed, to decide that people who had, in good faith, invested $750,000 upon both of these vessels and other vessels mortgaged, should be denied their right to get such of their money as they can out of the proceeds, by any strained construction of the act. I would be particularly loath to do that for the reason that, at the time this mortgage or deed of trust was prepared, the Ship Mortgage Act was a new thing. As I remember it, this mortgage was prepared within a few weeks, or, at most, within a month or two, after the Ship Mortgage Act became a law.

But, aside from that, I am convinced that the provision of the Ship Mortgage Act for the indorsement upon the papers of the vessel is merely directory, and failure to do so does not make the mortgage void, and I feel sure, likewise, that the inclusion of this stock in the deed of trust amounts to a mere pledge, and not a mortgage at all. The exceptions, therefore, or so much of the exceptions to the answers as go to the constitutionality of the act, and the allegation that the mortgage in this particular case is void, as it does not conform to the act, will be sustained, wthout leave to amend.

Now, then, in so far as the exceptions to the claims of the United States arising out of the transportation of opium are concerned, I am inclined to let that matter stand until the Attorney General has had time to send his brief out from Washington.