## THE HENRY W. BREYER.

(District Court, D. Maryland, January 12, 1927.)

1. Maritime liens ⬅➡30—Furnisher of supplies to agreed purchaser held not entitled to lien as against preferred mortgage later given to sellers, where inquiry would have disclosed situation; "possession" (Ship Mortgage Act 1920, § 30, subd. R [Comp. St. § 8146¼pp]).

Where an agreed purchaser of a vessel, title to which had not yet been transferred, but which was in the shipyard of sellers undergoing repairs, by agreement with sellers put on board a captain and crew, who were equipping and supplying her for service, it was in "possession," within the meaning of Ship Mortgage Act 1920, § 30, subd. R (Comp. St. § 8146¼pp); but in view of the contract of sale, which clearly contemplated the giving to sellers of a preferred mortgage on execution of the bill of sale, the purchaser was required to pay all expense incurred pending the transfer, and a furnisher of supplies on order of the purchaser is not entitled to a lien therefor, where on inquiry he could have learned the true situation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Possession.]

2. Shipping ⬅➡31—Mortgage is valid as soon as executed and recorded, though not immediately indorsed on ship's papers (Ship Mortgage Act 1920 [Comp. St. § 8146¼jjj et seq.]).

Under Ship Mortgage Act 1920 (Comp. St. § 8146¼jjj et seq.), a mortgage is valid as soon as executed and recorded, notwithstanding delay of indorsement on the ship's papers.

**3. Shipping ⟺32—"Priority of liens" under Ship Mortgage Act applies to all suits involving lien claims (Ship Mortgage Act 1920, § 30, subd. M [Comp. St. § 8146¼nnn]).**

The provision of Ship Mortgage, Act 1920, § 30, subd. M (Comp. St. § 8146¼nnn), relating to "priority of liens" on a ship sold in admiralty in a suit to enforce a preferred mortgage, is not limited to a suit, brought expressly to enforce the mortgage, but applies as well to a suit brought by other lien claimants in which the mortgage also is foreclosed.

**4. Carriers ⟺39—Duty of common carrier to shipper arises from its relation to the public, and no special contract is necessary.**

When the relationship of shipper and carrier is established, there is a duty imposed by law arising out of the relation which the carrier sustains to the public, and no special contract is necessary.

**5. Shipping ⟺32—Tort claims of shippers for breach of carrier's duty held "preferred maritime liens," entitled to priority over preferred mortgage (Ship Mortgage Act 1920, § 30, subd. M [Comp. St. § 8146¼nnn]).**

Where a ship, after receiving cargo on board, issuing bills of lading, and receiving prepayment of freight, failed to sail, the remedy of the shippers, at their option, is for breach of contract or in tort for breach of a duty imposed by law, and in the latter case their claims are "preferred maritime liens" against the ship, within Ship Mortgage Act, 1920, § 30, subd. M (Comp. St. § 8146¼nnn), which take precedence of a preferred mortgage.

**6. Shipping ⟺120—Receipt of cargo on board, knowing inability to proceed on voyage, is a tort.**

Receipt of cargo on board of ship, with prepayment of freight, where the owners knew that because of their insolvency the ship would probably be unable to proceed on the voyage, was constructively fraudulent, and constituted a tort.

**7. Shipping ⟺141(1)—Lack of funds held cause of delay, and crew's libel for wages not legal process, within bill excepting loss thereby.**

Where a ship, after receiving her cargo on board, was unable to sail for lack of funds, the filing of a libel for wages by the crew was not the cause of nonperformance of her duty to the shippers, within a provision of the bills of lading that the carrier should not be liable for loss caused by legal process.

**8. Maritime liens ⟺38—Corporate stevedore's claim for loading is not "preferred maritime lien" (Ship Mortgage Act 1920, § 30, subd. M [Comp. St. § 8146¼nnn]).**

Services furnished by a corporation stevedore in loading a ship do not give a "preferred maritime lien," under Ship Mortgage Act 1920, § 30, subd. M (Comp. St. § 8146¼nnn).

**9. Maritime liens ⟺38—Provision of preferred mortgage held waiver of preferred status in favor of lien for supplies furnished ship.**

A provision of a preferred mortgage, prohibiting mortgagor from imposing liens "other than for crew's wages, supplies, or salvage," *held* a waiver of the preferred status of the mortgage in favor of a lien for coal supplied the ship.

In Admiralty. Suit by Charles G. Walker and others against the steamship Henry W. Breyer. On distribution of proceeds of sale. Priorities determined.

Foley & Martin, of New York City, and Emory, Beeuwkes & Skeen, of Baltimore, Md., for James and Edwin A. Shewan.

Carter & Phillips, of New York City, and Janney, Ober, Slingluff & Williams, of Baltimore, Md., for Baker, Carver, and Morrell.

Word & Whip, of Baltimore, Md., for Steamship Terminal Co. and J. Jarka Co., Inc.

Janney, Ober, Slingluff & Williams, of Baltimore, Md., for A. J. Yarber.

Harry N. Abercrombie, of Baltimore, Md., for Wittenberg Coal Co.

G. W. S. Musgrave, of Baltimore, Md., for Grand Rapids Showcase Co.

Coleman, Fell, Morgan & Brune, of Baltimore, Md., for other shippers.

Griffin & Beatty, of Baltimore, Md., for Theodore H. Rohde.

SOPER, District Judge. The proper distribution of the proceeds of sale of the steamship Henry W. Breyer is the subject-matter of the controversies involved in this case. James Shewan and Edwin A. Shewan, who hold a preferred mortgage upon the vessel, claim the entire sum against divers persons, who, either before or after the execution of the mortgage, furnished repairs, supplies, or services to the ship, and against certain shippers of merchandise, who complain of the failure of the ship in the performance of her duties as a common carrier. The ship was seized in Baltimore upon a libel for crew's wages, and thereafter intervening libels were filed by the mortgagee and other claimants. The vessel was sold at public auction for $64,000.

The Breyer was formerly the Norwegian vessel Hallfried. Having been badly damaged by fire, her wreck was purchased by the Shewans and held in New York City for several years. In the latter part of 1925, the New York & Florida Navigation Corporation entered into negotiations with the Shewans for the purchase of the vessel for use in coastwise trade in the United States. For this purpose it was necessary that the ship be registered as an American vessel, which could be lawfully done under R. S. § 4136,

as re-enacted by Act Feb. 24, 1915, c. 57, 38 Stat. 812 (Comp. St. § 7714a). This section provides that the Secretary of Commerce may issue a registry or enrollment of such a wreck, when purchased by a citizen of the United States and repaired in a shipyard in the United States, if it shall be proved to the satisfaction of the Secretary that the repairs are equal to three times the appraised value of the vessel.

With this statute in view, the Shewans and the navigation corporation entered into an oral contract of sale of the ship "as is, where is, and how is, as of December 1, 1925." The agreed purchase price was $125,000, to be paid as follows: $12,500 on the making of the contract; $37,500 before the vessel sailed from New York and/or Baltimore; $25,000, with interest, on February 15, 1926; $15,000, with interest, on May 15, 1926; $15,000, with interest, on July 15, 1926; $20,000, with interest, on September 15, 1926—the deferred payments to be secured by a preferred mortgage. The sale, however, was conditional upon the transfer of the vessel's flag in accordance with the Wreckage Act (Comp. St. § 7714a). In order to make this possible, it was agreed that the vessel should be repaired by the Shewans in New York, at the floating dry docks of James Shewan & Sons, Inc., a corporation owned and controlled by them, at the expense of the navigation corporation, with the understanding, however, that, if the change of flag should not be effected, the navigation corporation should be released from any obligation either to take the vessel or to pay for the repairs. It was also understood that, while the repairs were being made, the navigation corporation might put a crew on board and do whatever was necessary to equip the vessel for active service at sea.

Accordingly, on December 18, 1925, the purchaser paid $12,500, and during the month put on board a captain and crew, who were employed in getting the gear ready for survey, while the Shewan corporation made the necessary repairs. On December 29, 1925, the parties were notified that American registry of the vessel could be made. Thereupon the purchaser, by a communication in writing to the vendors, which contains most of the terms of the oral agreement of sale, requested the vendors to deliver a bill of sale, in order that the ship might be documented and registered as an American vessel, agreeing, however, immediately upon the change of registration, to execute and deliver the preferred mortgage, and declaring

that, in the meantime, the bill of sale should not vest the actual title in the navigation corporation, but that the vessel should be held in trust for the vendors until the execution and delivery of the mortgage, whereupon the title should pass, subject, however, to the mortgage and a lien for repairs which had been made. The bill of sale was executed the same day, and purports to convey an absolute title to the ship, subject to the lien of the Shewan Corporation for the repairs referred to. It was duly recorded in the office of the collector of customs at New York on December 30. On the same day the vessel sailed from New York for Baltimore. On December 31 the preferred mortgage for $112,500, having been executed as agreed, was similarly recorded. The first payment of $37,500, due under the mortgage before the ship sailed, was not made.

### Claim of Baker, Carver, and Morrell.

[1] The claim of Baker, Carver, and Morrell for $8,302.57 covers equipment and supplies furnished to the ship between December 14 and December 28, 1925, upon the order of the president of the navigation corporation. Under these circumstances, the supply men claim, not only that they acquired a lien upon the vessel, under the provisions of subsections P, Q, and R of section 30 of the Act of June 5, 1920, 41 Stat. 1005 (Comp. St. §§ 8146¼ooo, 8146¼p, 8146¼ pp), but also that the lien is a preferred maritime lien under subsection M of section 30 of that act (Comp. St. 8146¼nnn). Subsections P, Q, R, and M are as follows:

"P. *Persons Entitled to Lien.* Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

"Q. *Persons Authorized to Procure Repairs, Supplies, etc.* The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel.

"R. *Same; Notice to Person Furnishing Repairs, Supplies, etc.* The officers and agents of a vessel specified in subsection Q shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed' purchaser in possession of the vessel; but nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

"M. *Preferred Maritime Lien; Priorities; Other Liens*—(a) When used hereinafter in this section, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this section; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.

"(b) Upon the sale of any mortgaged vessel by order of a District Court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all pre-existing claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of subsection L shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court."

Since the supplies were furnished before the mortgage was executed, it is necessary only to determine whether a lien arose when they were received by the ship. The existence of the lien depends (1) upon whether the goods were ordered by the owner of the ship or a person authorized by the owner, as described; and (2) upon whether the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that the person ordering the supplies was without authority to bind the vessel. It is suggested that the navigation corporation was not "an agreed purchaser in possession of the vessel,"

and therefore its president was not an authorized person within the terms of the statute. But undoubtedly there was a contract of purchase. It is so referred to in the letter of December 29, 1925. It is true that title to the vessel had not passed, and that the agreement might be nullified by failure to secure a transfer of the vessel's flag, but these features were merely incidents, and do not destroy the essential nature of the instrument as a contract of sale.

It is necessary, however, to find, not only that the navigation corporation was an agreed purchaser, but also that it was in possession of the vessel. The ship was in fact in the dry docks of the Shewan corporation, and was therefore subject to the control, at least to some extent, of the vendors. On the other hand, the captain, officers, and crew were on board the ship, busily engaged in equipping it for sea. Under these circumstances, the navigation corporation, by a fair interpretation of subsection R, was in possession of the vessel. The Oceana (C. C. A.) 244 F. 80.

The more serious question is whether the purchaser, in view of the terms of the agreement with the Shewans, was authorized to charge the vessel for supplies. The oral agreement contained no express provision forbidding the purchaser to place a lien on the vessel for supplies, or even that the purchaser should pay for such as he might order. Nevertheless an agreement on the part of the purchaser to pay for the equipment is necessarily implied from the circumstances of the case. The cash payment was only $12,500 on account of a total purchase price of $125,000. The vendors, through the Shewan corporation, were to place adequate repairs upon the boat to make her seaworthy, which actually cost $8,765.63. The whole transaction was contingent upon an American registry of the vessel, and, if this failed, the vendors were to pay for the repairs. There is no suggestion that in this event the vendors were also to pay for such equipment, services, and supplies as the purchaser might see fit to order. The letter of December 29, which was written after all of the supplies delivered by Baker, Carver, and Morrell had been received, refers only to the preferred mortgage and to the lien of the Shewan corporation for repairs. The bill of sale of December 30 also refers only to this bill for repairs. All these facts, and the care exercised by the sellers in requiring the purchaser to state in writing that the ship was held in trust for them during the interim

between the bill of sale and the execution of the mortgage, indicate that the parties understood that the purchaser was to pay all the expenses incurred by the ship pending the transfer, so that there would be no claim against her prior to the purchase-money mortgage and the claim of the Shewan corporation, which, in effect, belonged to the mortgagees.

If this situation could have been ascertained by the furnishers by the exercise of reasonable diligence—that is to say, if it could have found out by inquiry on their part—then the lien did not arise. The Circuit Court of Appeals for the Fifth Circuit, in The Yarmouth, 262 F. 250, relying upon The Kate, 164 U. S. 458, 17 S. Ct. 135, 41 L. Ed. 512, and The Valencia, 165 U. S. 264, 17 S. Ct. 323, 41 L. Ed. 710, held that a provision in a charter party requiring the charterer to provide and pay for coal was sufficient to prevent section 3 of the Act of June 23, 1910 (36 Stat. 604 [Comp. St. § 7785]), from having the effect of giving a lien on the ship for coal furnished on the order of the charterer, if the furnisher by the exercise of reasonable diligence could have ascertained the terms of the charter party. The extent of the duty of the furnisher to make inquiry is much broader than was supposed at the time of the decisions in The Oceana and The Yarmouth, and it is now well settled that nothing short of actual inquiry will suffice. United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361; The Moosabee (C. C. A.) 1 F.(2d) 964; United States v. Neponset, 13 F.(2d) 808, 1926 A. M. C. 964.

It was not only easily possible for Baker, Carver, and Morrell to have discovered the true relationship of the navigation corporation to the ship, but the preponderance of the evidence indicates that they did discover it. It is conceded that during the month of December a member of the firm communicated with the Shewan corporation, stated that the firm was receiving orders from the navigation corporation for supplies, and inquired if its credit was good. According to the employee of the Shewan corporation, the firm was told the true situation as to the proposed sale and warned that nothing should be supplied on the credit of the vessel. This warning is denied, but, bearing in mind the understanding between the vendor and the purchaser that the latter was to pay for supplies, the probabilities are very strong that the furnishers were informed as to the true status of affairs, and it is so held. There is other corroborative testimony in the

record, also disputed, which it is not necessary to discuss.

[2] The point is also made that the mortgage is not valid as against the furnishers of supplies, because it was not indorsed on the ship's papers, as required by section 30, subsection D of the Act of June 5, 1920 (Comp. St. § 8146¼kkk), until January 2, 1926, after she had arrived in Baltimore. The mortgage was recorded, however, in the custom house at New York, on December 31, 1925, in accordance with section 2 of the Act of February 16, 1925, c. 235, 43 Stat. 948 (Comp. St. § 8146¼kk [*l*]). The effect of the failure to indorse the documents of the vessel is settled by the case of Morse Drydock & Repair Co. v. Northern Star, 271 U. S 552, 46 S. Ct. 589, 70 L. Ed. 1082. The Supreme Court held that the mortgage is valid as soon as it is executed and recorded, even before its indorsement upon the ship's papers, but it does not have a priority over a lien on the vessel which attaches in the interval between the recording and the indorsement. No repairs or supplies were furnished, and no services were rendered to the vessel during this interval by any libelant in this case. The failure to indorse the mortgage immediately upon its execution is therefore immaterial. The intervening libel of Baker, Carver, and Morrell will be dismissed.

Claim of the Steamship Terminal Corporation.

This intervening libelant was engaged in the business of loading and discharging ships in New York City. It rendered services to the Breyer in New York on December 26, 1925, to the amount of $614.16, by providing wharfage, watchmen, stevedore services, and attending lights. It is not necessary to decide whether the services performed are within the terms of subsection P of section 30 of the Act of June 5, 1920, since, although the services were rendered before the execution of the preferred mortgage, the intervening libel must be dismissed, because it was possible for the libelant to have ascertained by the exercise of reasonable diligence that the navigation corporation, by whom the services were ordered, was without authority to bind the vessel therefor. As a matter of fact, the libelant made no investigation whatsoever. Had one been made, there is no reason to doubt that information similar to that which was given to Baker, Carver, and Morrell would have been furnished.

### Shippers' Claims.

Certain shippers of goods to be carried by the Breyer from Baltimore to Miami have filed intervening libels, laying claim for damages occasioned by loss of the goods shipped, or by delay in delivery or complete failure to deliver goods on which the freight was prepaid. The evidence shows that, while the vessel was on its first voyage to Miami, agents of the navigation corporation, located at Baltimore, advertised a fast freight service by the ship from Baltimore to Miami, sailing February 10–12, 1926. The vessel arrived light in Baltimore on February 12, and began to load a cargo of goods belonging to various shippers. The loading was finished on February 23. She then lay idle at her dock until February 27, when she was moved into the stream and anchored. She continued idle until March 4, when she was seized by the United States marshal under the original libel filed in this case by certain seamen, claiming that they had been served with unfit food and that their wages were in arrears. On March 9, the agents of the vessel notified the shippers that the vessel had not sailed, and no idea could be given when she would sail. On March 10 an intervening libel was filed by the Shewan corporation for the repairs made to the vessel prior in December, in the city of New York.

On March 13, upon the petition of the Shewan corporation, this court passed an order for the sale of the vessel, directed that she be towed to a suitable wharf, and that notice be given to the shippers of cargo of her location, and granted permission to the shippers to remove their cargo at their own expense after March 15. On March 18, upon the petition of the master of the vessel, this court ordered the marshal to purchase such provisions and coal as might be required for the preservation of the crew and the safety of the vessel, at an expense not to exceed $600. The shippers were fortunately able to arrange with the Mallory-Hasler Line to remove the goods from the vessel and transship them without cost, upon the same terms for the transportation of the goods which they had formerly made with the agents of the Breyer. Consequently the losses of the shippers who intervened as libelants were limited to the amount of the freight prepaid to the ship, with the exception of A. J. Yarber, whose claim is for damages for loss of goods.

In addition to the facts drawn from the records of the court relating to the financial condition of the corporation owning the ship, the evidence shows that during the period in question the corporation was in difficulties. Neither the sum of $37,500, payable before the vessel left New York or Baltimore on its first voyage, nor the sum of $25,000, due on February 15, was paid. The individuals interested in the corporation were unable or unwilling to advance additional money to save what had already been paid in, and which was apparently lost. The financial situation is not given in detail, but there is nothing in the record to suggest that it was any worse on March 4, when the original libel was filed, than it was during the interval between February 12 and 23, when the cargo was taken on board.

[3] Under these circumstances, it is beyond dispute that the shippers acquired a lien upon the vessel for the damages sustained, under the familiar maxim that the ship is bound to the cargo and the cargo to the ship. The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772. But the shippers contend, further, that the lien so acquired was superior to that of the mortgagee under the preferred mortgage, since there was not in this case "a sale of a mortgaged vessel by order of a District Court of the United States in a suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon," as provided by the Act of June 5, 1920, c. 250, § 30, subsec. M, 41 Stat. 1004 (Comp. St. § 8146¼nnn). It is argued that it is only in such a proceeding that the preferred mortgage lien has priority over all claims against the vessel, "except (1) preferred maritime liens and (2) expenses and fees allowed and costs taxed by the court." The vessel was not sold specifically to enforce the preferred mortgage lien thereon, but was sold upon the petition of the Shewan corporation, an intervening libelant, which had furnished repairs prior to the execution of the mortgage. The sale took place on April 8, 1926. A petition to foreclose the mortgage was filed by the mortgagee on April 13, 1926.

The point has apparently not been passed on heretofore, although the reported cases indicate that the lien of a preferred mortgage has been given the same priority, whether the mortgagee proceeded by an intervening libel or by a direct proceeding to enforce the mortgage. The Nanking (D. C.) 292 F. 642; The Northern Star (C. C. A.) 7 F.(2d) 505; Id., 271 U. S. 552, 46 S. Ct. 589, 70 L. Ed. 1082. The practice is in accord with the manifest intention of Congress. One great purpose of the Ship Mortgage Act, as pointed out in The Nanking,

supra, was to keep abreast with the modern methods of finance and the ever-increasing volume of our foreign commerce. It was provided by section 30, subsection H (41 Stat. 1002 [Comp. St. § 8146¼m]), that a preferred mortgage might bear such rate of interest as should be agreed to by the parties. It was intended that the lender of money upon a ship should have a greater security than an ordinary maritime mortgage affords. It would be entirely inconsistent with these considerations to hold that it was the intention of Congress to confine the priority of a preferred mortgage to cases in which the sale of the vessel should be made in a suit expressly brought for the enforcement of the mortgage lien, and to destroy the preferred character of the mortgage in every case in which the vessel should be sold at the instance of some other claimant or lienor. The mortgagor is entitled to take the ship anywhere in the world, and she may be sold at a distant place at the instance of a lienor before the mortgagee can institute appropriate proceedings to enforce the mortgage. The obvious purposes of the act would be frustrated, if it should be so interpretated as to leave the mortgagee at the mercy of circumstances over which, in many instances, he can have no control.

It is not necessary to give subsection M such an application as to bring about this distorted result. Subsections L and M of section 30 (Comp. St. §§ 8146¼nn, 8146¼nnn) describe the proceedings of the court in a suit in rem in admiralty for the enforcement of preferred mortgage liens. The appointment of a receiver and the seizure of the vessel by the marshal are authorized. Upon the sale in such a proceeding, the pre-existing claims shall be held terminated, and shall thereafter attach in accordance with their respective priority to the proceeds of sale, giving the preferred mortgage a priority over all claims except preferred maritime liens, expenses, and costs. Subsection D, on the other hand, declares the conditions upon which the validity of a preferred mortgage depends, and provides that such a mortgage shall have the preferred status given by the provisions of subsection M. The meaning is that a valid preferred mortgage shall have generally the same status as is conferred by subsection M upon such a mortgage in the event of a sale in a suit in rem to enforce it.

The pending proceeding, as pointed out above, was begun by a libel for wages filed on behalf of members of the crew. The sale was ordered at the instance of an intervening libelant, which was in fact owned and controlled by the mortgagees. Before the funds were distributed, the mortgagee filed a libel to foreclose the mortgage. The proceeding is very nearly a literal compliance with the provisions of subsection M, and the mortgage is entitled to the priority specified therein.

The shippers, in addition, contend that in any event their liens are preferred maritime liens, which, under subsection M, have priority over the lien of the preferred mortgage, in that they are liens for damages arising out of torts committed by the ship in violation of her duties as a common carrier. The vessel was a general ship carrying goods for hire, and was consequently a common carrier according to the settled law. Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 437, 9 S. Ct. 469, 32 L. Ed. 788. Having held herself out, through her agents, as such a carrier, it was the first duty of her owners to provide her with reasonable facilities for the transportation of the goods. Having accepted the goods for transportation without notice of inability on her part to perform the service due, the ship was obliged to transport the goods without unreasonable delay. Hutchinson on Carriers (3d Ed.) § 495; Wabash R. R. Co. v. Pearce, 192 U. S. 179, 187, 24 S. Ct. 231, 48 L. Ed. 397; Eastern Ry. Co. v. Littlefield, 237 U. S. 140, 35 S. Ct. 489, 59 L. Ed. 878.

[4] The intervening libels of the shippers sound in tort, on the theory that they are entitled to recover damages for breach of the carrier's common-law duty, notwithstanding that the carrier's default was also a breach of the contract expressed in the bill of lading. The responsibilities of a common carrier may be restricted by contract, but the nature of its occupation makes it a common carrier still. Liverpool & G. W. S. S. Co. v. Phœnix Ins. Co., 129 U. S. 397, 440, 9 S. Ct. 469, 32 L. Ed. 788. It is well established that ordinarily the owner of the goods damaged by the dereliction of a common carrier has the option to bring action either in contract or in tort. "Where, from a given state of facts, the law raises a legal obligation to do a particular act, and there is a breach of that obligation, and a consequential damage, there, although assumpsit may be maintainable upon a promise implied by law to do the act, still an action on the case founded in tort is the more proper form of action." Di Giorgio Co. v. Penn. R. Co., 104 Md. 693, 701, 65 A. 425, 428 (8 L. R. A. [N. S.] 108). In other

words, when the relationship of shipper and carrier is established, there is a duty imposed by law which arises out of the relations which the carrier sustains to the public, and no special contract is necessary. See, also, Atlantic & Pacific R. Co. v. Laird, 164 U. S. 393, 17 S. Ct. 120, 41 L. Ed. 485; Hutchinson on Carriers (3d Ed.) § 1321 et seq.; B. & O. R. R. v. Pumphrey, 59 Md. 390, 399; M. & M. Trans. Co. v. Eichberg, 109 Md. 211, 71 A. 993, 130 Am. St. Rep. 524; Central Trust Co. v. East Tennessee Co. (D. C.) 70 F. 764.

[5] The mortgagees concede that the rules laid down are applicable to claims for damages arising out of loss or injury to goods which are actually transported, but contend that the shippers did not suffer from the loss of or injury to their shipments, but merely from delay on the part of the carrier in the act of transportation. It is said that it is not a tort for a carrier to fail to forward goods promptly. Mallory S. S. Co. v. Garfield (C. C. A.) 10 F.(2d) 664. The trial court in that case held the agent of the carrier liable for loss occasioned by a delay in the delivery of a shipment of cotton, on the ground that the action was properly brought in tort for which not only the principal but the agent might be held liable. On appeal the judgment was reversed. It was held that the suit should have been brought in contract, for the breach of which the agent of the disclosed principal was not liable. The court said: "Liability may be imposed, where goods are damaged by a carrier, both in contract and in tort; but in the one case it violates the contractual obligation to use due care, and in the second case the obligation not to damage property by negligence. However, it is not a tort for a carrier to fail to forward goods promptly, nor is it for the agent of the carrier. The duty to transport promptly is derived from the contract of carriage. The default, if any, in forwarding the goods, is the failure to perform a contractual obligation; that is, to act as the forwarding agent for the owner under the carrier's obligation to deliver the goods to the next carrier. Hutchinson on Carriers, § 139." No authority is given for the general proposition. Hutchinson, § 139, shows merely that each succeeding carrier in a continuous line becomes the agent of the owner of the goods to make delivery to the next carrier.

It is noteworthy that two of the cases cited by Hutchinson, to wit, Dunham v. Boston & Maine Ry. Co., 70 Me. 164, 35 Am. Rep. 314, and Sherman v. Hudson River R.

Co., 64 N. Y. 254, are instances of suits in tort to recover damages for unreasonable delay in the transportation and delivery of nonperishable goods. There was no loss or injury of the goods, but the damages to the shippers were occasioned by decline in price or loss of market. It was assumed, without discussion, that the actions were properly brought in tort. Moreover, there are many cases in which damages are sought for injuries to perishable goods caused solely by unreasonable delay in transportation, in which the courts have held that the carrier, having assumed the common-law duty to forward the shipment without unnecessary delay or detention, is liable in an action of tort for damages arising from negligent performance of the duty. Phila., Wilm. & Balt. R. Co. v. Lehman & Bro., 56 Md. 210, 227, 40 Am. Rep. 415; Penn. R. Co. v. Clark, 118 Md. 514, 85 A. 613; Central Trust Co. v. East Tennessee Co. (D. C.) 70 F. 764; Thomas v. Lancaster Mills (C. C. A.) 71 F. 481; Missouri, K. & T. Ry. Co. v. Truskett (C. C. A.) 104 F. 728, affirmed, 186 U. S. 480, 22 S. Ct. 943, 46 L. Ed. 1259; St. Louis R. R. v. Wilson, 85 Ark. 257, 107 S. W. 978; Young v. R. R. Co., 113 Me. 113, 93 A. 48; Joynes v. Penn. R. R., 235 Pa. 232, 83 A. 1016, Ann. Cas. 1913D, 964; Spence v. Norfolk R. R., 92 Va. 102, 22 S. E. 815, 29 L. R. A. 578; Denman v. Chicago R. R. Co., 52 Neb. 140, 71 N. W. 967; Hutchinson on Carriers (3d Ed.) § 1321, et seq.; Southern Ry. Co. v. Langley, 184 Ala. 524, 63 So. 545. The negligence of the carrier is the same, whether the decline in the value of the goods be due to a deterioration of the physical quality or to the loss of market.

Furthermore, it is more accurate to describe the default of the ship in the case at bar as a complete failure to carry, rather than a mere delay in transportation. As a matter of fact, the shippers lost nothing by the delay to which they were subjected. The goods were transshipped without additional expense, and the shippers do not claim to have been injured by the delay in the delivery of the goods at the destination. The loss was occasioned by the complete failure of the ship to furnish the facilities which it held itself out to the community as possessing. The only reason for the failure of the vessel to break ground was the financial inability of the owner. It did not have the funds to coal the ship or pay the crew, and the vessel was consequently unable to sail. Having, therefore, failed in a duty imposed by the law, the ship was guilty of tort, and

the shippers were entitled to recover the prepaid freight in an action of negligence.

[6] On another ground, the shippers were justified in alleging that they were damaged by acts of the vessel which amounted to torts. The complete financial inability of the owner of the vessel to comply with the obligations of a common carrier is so clearly shown by the testimony that it must have been known to the managers of the vessel when the cargo was taken on board. The action, therefore, in accepting the goods, and particularly in receiving the freight money in advance, from the intervening libelants, was in effect fraudulent. The navigation corporation was doubtless insolvent, and the situation was analogous to that which has been frequently before the courts in reclamation proceedings in bankruptcy. It is a general principle that, when a person who is insolvent purchases goods with no intention of paying for them, and conceals his insolvency and his intention not to pay, he is guilty of fraud which entitles the vendor to recover the goods. Knowledge of inability to pay when the purchase is made is equivalent to purchase with intent not to pay. Such purpose is constructively fraudulent. In re Henry Siegel Co. (D. C.) 223 F. 369; Gillespie v. Piles & Co. (C. C. A.) 178 F. 886; Horner v. Henning, 93 U. S. 228, 23 L. Ed. 879; In re K. Marks & Co. (C. C. A.) 218 F. 453; Jones v. H. M. Hobbie Grocery Co. (C. C. A.) 246 F. 431; In re Liebig (C. C. A.) 255 F. 458; In re Stewart (D. C.) 178 F. 463; In re Kenyon (D. C.) 156 F. 863. It was equally fraudulent for the ship to accept payment for services which she was clearly unable to perform.

[7] The mortgagees make the claim, however, that the failure of the ship to sail and carry the goods was due to the filing of the libels in this case, relying upon a provision in the bills of lading that the shipowner should not be liable in any capacity for loss, damage, or delay arising from legal process, citing the case of the Estrada Palma (D. C.) 8 F.(2d) 103. It is clear, however, in the case at bar, that the real cause of the failure of the vessel to carry the goods was not the legal process issued from this court, but her own inadequate resources, as pointed out above. The legal process was the result, and not the cause, of the failure of the vessel to comply with her contractual and common-law duties. The failure of the vessel to transport the goods, and the torts thereby committed, were complete, and the right of action of the intervening libelants had already matured, before the legal process was filed. The conclusion is that the shippers were justified in bringing their libels in tort, and that their liens upon the vessel are preferred liens with relation to the preferred mortgage.

### Claim of A. J. Yarber.

The claim of A. J. Yarber is also a preferred maritime lien, since it is based upon a loss of the goods of a shipper carried by the ship on her first voyage.

### Claim of F. Jarka Company, Inc.

[8] F. Jarka Company, Inc., is engaged in the business of marine contractor and general stevedore. The intervening libel claims the sum of $2,289.43 for services in loading and unloading the steamship H. W. Breyer in Baltimore on February 4 and March 9, 1926. The libelant contends that it is entitled to the preferred maritime lien provided by subsection M "for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel." It is perhaps still open to debate whether subsection P of section 30 of the Act of June 5, 1920 (41 Stat. 1005 [Comp. St. § 8146¼ooo]), gives a lien to a person furnishing stevedore services. The Muskegon (D. C.) 275 F. 117, Id. (C. C. A.) 275 F. 348; The Liberator (D. C.) 298 F. 159; The Henry S. Grove (D. C.) 285 F. 60; The Neponset (D. C.) 300 F. 981; In re Burton S. S. Co. (D. C.) 3 F.(2d) 1015.

But it is not necessary to decide this question in the case at bar, for, even if the services of a corporation stevedore give rise to a maritime lien on a vessel under subsection P, it is nevertheless true that the services of such a stevedore are not a preferred lien under the provisions of subsection M above quoted. A comparison of the language of the two subsections is helpful. Subsection M declares that a preferred maritime lien shall include a lien "for wages of a stevedore when employed directly by the owner," etc. Subsection P provides that "any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel," etc., shall have a maritime lien on the vessel. By the latter section it is obvious that a maritime lien is conferred expressly upon any person who furnishes necessary services of the kind described, whether they be performed by the furnisher or some one else on his behalf; whereas, a preferred maritime lien does not exist in the case of a stevedore unless it be a lien for wages of a stevedore when employed direct-

ly by the owner, etc. The last phrase is clearly confined to the case of the individual laborer who personally performs the services of loading or unloading the ship. It seems to be outside the scope of reasonable argument to contend that a stevedore employed by a contracting stevedore is employed directly by the owner or operator of the vessel. The difference between the legal rights and liabilities which arise, on the one hand, when the contractor furnishes laborers to a vessel, and, on the other, when the laborers are employed directly by the ship, is shown by the following cases: The Seguranca (D. C.) 58 F. 908; The Chicklade (D. C.) 120 F. 1004. It was obviously the intention of Congress to give the same protection to the wages of individual stevedore workmen as was given in the same clause of subsection M to the wages of the crew of the vessel. The claim of F. Jarka Company, Inc., must be deferred to the lien of the preferred mortgage.

### Claim of the Wittenberg Coal Company.

[9] The Wittenberg Coal Company furnished 334⁷⁄₂₀ tons of coal at $5.50 per ton, amounting to $1,838.93 to the ship on January 13, 1926. Undoubtedly the claimant is entitled to a lien on the ship for the coal furnished under subsection P of section 30 of the Ship Mortgage Act of 1920, providing that any person furnishing supplies or other necessaries to a vessel shall have a maritime lien thereon. The sole question is whether this lien has priority over the lien of the preferred mortgage. It is clear that it is not one of the preferred liens under the terms of subsection M, since it did not arise prior to the recording and indorsement of the mortgage, nor did it arise out of tort, wages of stevedores or crew, or general average or salvage. The claimant, however, calls attention to section 5 of the mortgage from the New York & Florida Navigation Company to James Shewan et al., which is as follows:

"That neither the mortgagor nor the master of the vessel, nor any one acting in its or his behalf, has or shall have any right, power, or authority to create, incur, or permit to be placed or imposed upon the vessel, or any part thereof, subject to this mortgage, any liens whatsoever other than for crew's wages, supplies, or salvage."

Obviously this section clothed the mortgagor or master of the vessel with power to create an indebtedness for supplies, and to subject the vessel to a lien therefor. The master was thereby enabled, wherever the vessel might be, to pledge her credit, not only to raise money to pay the crew, but also to buy the necessary supplies. Moreover, in order to make this authority practically effective, the lien was intended to have priority over that of the mortgage. The authority to purchase supplies is grouped in the same clause with the authority to impose liens upon the vessel for wages or salvage, which, under the Ship Mortgage Act, give rise to preferred maritime liens. It is therefore a fair conclusion that the parties to the mortgage intended to put all three liens in the same category. Subsection S of section 30 of the act (Comp. St. § 8146¼ppp) provides that nothing in section 30 of the act shall be construed to prevent the mortgagee from waiving his right to a lien, or, in the case of a preferred mortgage lien, to the preferred status of such a lien, at any time by agreement or otherwise.

The tacit permission given by the mortgagee to the imposition of a lien on the ship for supplies is pro tanto a waiver on the part of the mortgagee of the preferred status of the preferred mortgage lien. The claim of the Wittenberg Coal Company has priority over the mortgage.