# THE FORT ORANGE.
# THE BERKSHIRE.
# THE TROJAN.
# THE RENSSELAER.

## CITY BANK FARMERS' TRUST CO. v. HUDSON RIVER NAVIGATION CORPORATION.

District Court, S. D. New York.

Dec. 20, 1933.

Mitchell, Taylor, Capron & Marsh, and Burlingham, Veeder, Fearey, Clark & Hupper, all of New York City (Mansfield Ferry, Henry L. Glenn, and Ray Rood Allen, all of New York City, of counsel), for City Bank Farmers' Trust Co.

Rogers & Whitaker, Crowell & Rouse and Kirlin, Campbell, Hickox, Keating & Mc-Grann, all of New York City (Spier Whitaker, E. Curtis Rouse, Delbert M. Tibbetts, and Harold B. Finn, all of New York City, of counsel), for Maritime Lienors Standard Oil Co. and others.

Kenneth K. Mackenzie, of New York City (John J. McManus, of New York City, and Randolph W. Childs, of Philadelphia, Pa., of counsel), for bondholders' committee.

Herman L. Weisman, of New York City, for trustee in bankruptcy of Hudson River Navigation Corporation.

KNOX, District Judge.

On December 1, 1925, this court, which had for several years administered the affairs of Hudson Navigation Company in an equity and mortgage foreclosure suit, made a decree for the sale of the assets of the corporation. At the auction held on February 4, 1926, the properties were sold to Assets Purchasing Corporation. Nineteen days later this sale was confirmed. Some time thereafter, the bids of the purchasers were assigned to Hudson River Navigation Corporation, and that company, under suitable conveyances, acquired all the property, real and personal, that had belonged to Hudson Navigation Company. It included four steamers, known, respectively, as the Fort Orange, Berkshire, Trojan, and Rensselaer. The transfer of the vessels was accomplished by means of individual bills of sale, one for each vessel.

Prior to the date upon which title was to pass under the bids made at the sale above mentioned, Assets Purchasing Corporation had arranged to borrow such funds as were necessary to complete the purchase, and had contracted to execute a mortgage upon all such tangible property as it should acquire thereunder. This mortgage was to secure a bond issue of the par value of $3,000,000. When Hudson River Navigation Corporation took over the bids of Assets Purchasing Corporation, it assumed the latter's obligation with respect to the proposed mortgage transaction.

These preliminaries being out of the way, title to the properties of Hudson Navigation Company passed to Hudson River Navigation Corporation upon May 5, 1926. The mortgage securing the bond issue was executed and delivered to the Farmers' Loan & Trust Company (now known as City Bank Farmers' Trust Company), as trustee, within a few minutes of the moment at which the mortgagor acquired title to the properties. At 3:15 p. m., an hour or so following the completion of the title closing, just described, the new owner of the properties caused each of the bills of sale covering the vessels which had comprised the passenger fleet of the Hudson Navigation Company to be recorded in the proper office of the customs house, at the port of New York. After a lapse of five minutes, the mortgage was similarly recorded. A quarter of an hour later, the four vessels were documented in the office of the collector of customs at New York as vessels of the United States. A counterpart of the mortgage was recorded in the office of the register of New York county at 3:50 p. m. of the same day, and was transcribed in Liber 367 of Mortgages at page 418.

On January 18, 1932, the City Bank Farmers' Trust Company, as mortgage trustee, filed the present bill in equity, alleging defaults in the terms of the aforesaid mortgage. Among other things, the court was asked to decree the mortgage to be a valid lien upon all the mortgaged property and a preferred

lien upon the vessels named in the indenture, under the provisions of the Ship Mortgage Act of June 5, 1920 (46 USCA § 911 et seq.). Foreclosure and sale of the mortgaged property was likewise sought. Hudson River Navigation Corporation appeared and consented to the appointment of a receiver of the mortgaged property. Upon May 19, 1932, the mortgage trustee also filed a libel in admiralty against the steamships Fort Orange, Berkshire, Trojan, and Rensselaer. In this latter suit, prayer was made that the mortgage be declared a valid lien upon the vessels, superior to all other claims and liens, except preferred maritime liens, and for a decree of foreclosure upon each of the vessels.

Upon July 13, 1932, the mortgagor corporation was adjudicated a bankrupt under an involuntary petition in bankruptcy filed in this district on January 30, 1932. In due course a trustee was elected. On August 17, 1932, the court entered an interim decree in the equity cause. By orders dated December 12, 1932, the trustee in bankruptcy was permitted to intervene in both the equity and admiralty suits. On February 4, 1933, he filed answers, and on April 28, 1933, amended answers, in both causes.

At this point, attention should be called to the fact that prior to the institution of suit by City Bank Farmers' Trust Company in either the equity or admiralty causes Standard Oil Company of New Jersey, United Dry Dock Company, Inc., and Tietjen & Lang Dry Dock Company, each claiming maritime liens upon the steamers, Berkshire, Trojan, and Rensselaer, had libeled the vessels in both the Southern and Northern districts of New York, and they had been taken into custody by the United States marshals for such judicial districts. The libels so filed proceeded to decrees; the liens against the vessels being liquidated as follows: Steamship Berkshire, $26,577.29 plus interest; steamship Trojan, $18,491.59 plus interest; steamship Rensselaer, $17,061.96 plus interest.

The corporations holding these liens appeared specially in the suit of City Bank Farmers' Trust Company, as mortgage trustee, upon the equity side of the court, and generally in the admiralty cause. In the latter litigation, the lienors assert their liens to be of superior rank to any that may exist under the terms of the mortgage held by mortgage trustee. The issue thus raised is of vital importance to these litigants and it, together with others hereinafter specifically mentioned, must here be determined.

With this outline of the status of the parties before the court, I may proceed to sketch the chronology of events having a bearing upon the adjudication to be made.

The interim decree of August 17, 1932, in the equity suit, had upheld the validity and priority of the lien of the mortgage with respect to the following property:

(1) A fund amounting to $1,707,551.28, being part of the money received by the mortgage trustee as a result of condemnation proceedings instituted by the city of New York against Pier New No. 32 owned by the mortgagor.

(2) The sum of $45.99 then held by the mortgage trustee in a sinking fund account, which had been set up pursuant to a provision contained in the mortgage.

(3) A lease dated January 1, 1915, relating to certain dock and river front property in Albany, N. Y., and designated in the mortgage as parcel No. 3. In this instrument, the city of Albany was the lessor and the Albany River-Front Company, Inc. was lessee.

(4) A lease dated July 1, 1916, relating to the same property, in which the Albany River-Front Company was lessor and the Hudson River Navigation Company was lessee.

(5) All the right, title, and interest of the mortgagor in and to all the machinery, sheds, dock equipment, and other property then situated upon or used in connection with the above-mentioned Albany property, which was owned by the mortgagor *at the time of the execution of the mortgage.*

(6) All the right, title, and interest of the mortgagor in and to all the office furniture, supplies, and equipment, safes, tools, and trucks situated upon the above-mentioned property, upon Pier New No. 32 (referred to as parcel No. 1 in the mortgage), and upon the property located at Kingston, N. Y. (referred to in the mortgage as parcel No. 2) *at the time of the execution and delivery of the mortgage.*

(7) The rents, incomes, earnings, issues, and profits from the properties referred to in the four preceding paragraphs, numbered 3, 4, 5, and 6, accruing on or after January 18, 1932, and from the sum of $1,707,551.28 of the remainder of said sum, accruing on or after March 21, 1932.

The interim decree, as amended by an order of September 2, 1932, expressly reserved the following questions for further determination:

(1). Whether the mortgage is a valid and subsisting lien upon the vessels Fort Orange,

Berkshire, Rensselaer, and Trojan, and, if so, whether such lien is prior to any other lien which may have attached to any or all of the said vessels; and whether the mortgage constitutes a valid lien upon the earnings, rents, and profits from the said vessels, and, if so, whether such lien is prior to any other lien which may have attached to such earnings, rents, and profits.

(2) Whether the mortgage constitutes a lien upon the moveable property (machinery, equipment, etc.) enumerated in connection with the Albany leases (referred to as parcel No. 3 in the mortgage), which was acquired by the mortgagor *after the date of the execution and delivery of the mortgage.*

(3) Whether the mortgage constitutes a lien upon the office furniture, safes, tools, etc., situated upon or used in connection with the Albany property (parcel No. 3), Pier New No. 32 (parcel No. 1), and the property located at Kingston, N. Y. (parcel No. 2), *that was acquired after the date of the execution and delivery of the mortgage.*

(4) All questions with respect to the validity and ownership of bonds of the face value of $78,000 referred to in article X of the interim decree.

(5) All questions not expressly determined by the interim decree.

The matters so reserved in the equity suit, as well as questions relating to the validity and priority of the mortgage upon the vessels, and their earnings, raised in the admiralty action, are now before the court.

In order to facilitate a disposition of the two actions and to prevent needless repetition of testimony, the evidence with respect to all issues was received simultaneously in both the suit in equity and the suit in admiralty. For like purposes of convenience, and since an issue is raised as to the propriety of foreclosing a preferred maritime mortgage in the equity suit, and as to the effect, if any, which the prior filing of that bill has upon the admiralty suit, the questions presented in the admiralty suit will also be here considered.

The holders of the aforementioned liens, which had arisen out of supplies furnished, and work done upon the respective steamers, objected to the jurisdiction of equity to foreclose the preferred ship mortgage, and prayed that the bill be dismissed as against the vessels. This jurisdictional question, therefore, should first receive attention.

The point particularly stressed by the maritime lienors is that in equity the court can foreclose a ship mortgage only as an equitable lien, and that jurisdiction must be founded solely upon a diversity of citizenship between the parties, and the presence of an adequate controversial sum of money. They further contend that the mortgage trustee is seeking inconsistent remedies by suing both in equity and in admiralty, with the result that, by first bringing suit in equity, it has elected to foreclose the mortgage as an equitable lien and has waived any right it might otherwise have to foreclose the instrument as a preferred ship mortgage in admiralty. Failing judicial approval of this contention, the argument is that, if the institution of the suit in equity is not to be regarded as an election, the mortgage trustee should be required to make the same before being awarded foreclosure either in equity or in admiralty.

The equity bill of the mortgage trustee, however, does not seek to foreclose the mortgage as an equitable lien. It prays for its foreclosure as a preferred mortgage under the Ship Mortgage Act (46 USCA § 911 et seq.), just as is sought by the libel in admiralty. There is therefore no such question of election between inconsistent remedies, as the maritime lienors describe. The question raised is simply whether jurisdiction to foreclose a preferred ship mortgage resides in equity, admiralty, or both. If only one of these courts is vested with jurisdiction, there is no question of election because there is no right to choose. The fact that the mortgage trustee may have mistakenly attempted in one forum to exercise a statutory right which cannot there be vindicated, without any intention of waiving any portion of such right, does not deprive it of the privilege of subsequently demanding its due in a court that is empowered to award relief. Wm. W. Bierce v. Hutchins, 205 U. S. 340, 27 S. Ct. 524, 51 L. Ed. 828; Northern Assurance Company v. Grand View Building Association, 203 U. S. 106, 27 S. Ct. 27, 51 L. Ed. 109. It is therefore necessary to determine, at this point, the proper forum for the foreclosure of a preferred ship mortgage.

The provisions of the Ship Mortgage Act (41 Stat. 1003, 46 USCA § 951) that are here pertinent, read as follows: "A preferred mortgage shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel. Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit in rem in admiralty. Original jurisdiction of all such suits is granted to the district courts of

the United States exclusively. In addition to any notice by publication, actual notice of the commencement of any such suit shall be given by the libellant, in such manner as the court shall direct. * * * ''

■ An admiralty court, as is conceded by all parties, was without jurisdiction to foreclose a ship mortgage prior to the enactment of the Ship Mortgage Act. Until that statute declared to the contrary, a ship mortgage could not have the status of a maritime contract. See The J. E. Rumbell, 148 U. S. 1, 13 S. Ct. 498, 37 L. Ed. 345; Schuchardt v. Babbage, 19 How. (60 U. S.) 239, 15 L. Ed. 625; Bogart v. The John Jay, 17 How. (58 U. S.) 399, 15 L. Ed. 95; Benedict on Admiralty (5th Ed.) §§ 71, 77.

■ The above-quoted portion of the ship mortgage statute clearly reveals that properly executed and filed ship mortgages are now to be regarded as maritime in their nature, and are capable of enforcement in actions in rem in the admiralty branch of the District Courts of the United States. In other words, the act created a new maritime right with respect to which the admiralty can give appropriate relief. The silence of the statute concerning any right that a ship mortgagee may have to foreclose his mortgage in equity cannot be regarded, as urged by the mortgage trustee as conferring jurisdiction upon a District Court, sitting in equity, to foreclose the mortgage here in suit as a preferred mortgage. The hearings of the congressional committees having charge of the drafting of the statute, and upon which the mortgage trustee places reliance in support of its contention, make this abundantly clear. See hearings before the Committee on the Merchant Marine and Fisheries of the House of Representatives: S. M. pp. 9, 10 on August 27, 1919 on H. R. 8422; S. M. p. 10 on September 25, 1919 on H. R. 9419; S. M. p. 47 on February 6, 1920 on H. R. 9419; S. M. pp. 32, 33 on September 11, 1919 on H. R. 8673.

At one stage in the process of formulating the statute, the proposed enactment carried a provision that foreclosure of a ship mortgage should be had in equity and not in admiralty. This was in deference to the view that Congress could not make the foreclosure of a ship mortgage a subject of admiralty jurisdiction. This view, however, did not finally prevail, and the Congress decided in favor of its power to declare ship mortgages to be maritime liens which should be enforceable by proceedings in rem in the admiralty. The obstacles which lay in the way of a court of equity in exercising a personam jurisdiction and in extinguishing maritime liens were regarded as more insurmountable barriers than were the difficulties to be encountered through creation of a new maritime right to be enforced in a court of admiralty. The power of Congress to legislate as it did in enacting the ship mortgage statute is not here questioned. As a result, the matter need not be discussed. Observation may be made, nevertheless, that numerous decisions have upheld the statute. The Oconee (D. C.) 280 F. 927; The Nanking (D. C.) 292 F. 642; The Lincoln Land (D. C.) 295 F. 358; Detroit Trust Co. v. Barlum S. S. Co. (D. C.) 56 F. (2d) 455. See also The Ocean View (D. C.) 21 F. (2d) 875. These decisions also have uniformly construed the act as providing an exclusive remedy by suit in rem in admiralty. This is in conformity with the language of the act itself. The provision that ''the libellant'' shall give certain notice of the commencement of a foreclosure suit plainly indicates the contemplation of the statute that such suit should lie only in admiralty. Had Congress intended to attempt to confer jurisdiction of this class of action upon courts of equity, the intention, it would seem, would have been made manifest by leaving in the statute, as enacted, the provision of the draft which conferred such jurisdiction. The absence of any such provision is persuasive that the Congress concluded to confine jurisdiction in the premises to courts of admiralty. Nor does it follow that, because a court of equity had power before the act to foreclose a ship mortgage as an equitable lien, it now has power to foreclose a *preferred* ship mortgage as a preferred maritime lien. The act, while it deprived the federal equity courts of no jurisdiction theretofore exercised, was careful to vest them with no new powers. A new maritime right having come into existence, it is to be enforced within the forum wherein rights of like quality are adjudicated. Equity courts, consequently, are not authorized to deal with this subject-matter. The bill in equity in the instant case, therefore, must be dismissed in so far as it seeks to foreclose the mortgage in suit as a preferred mortgage upon the vessels.

Turning now to the admiralty suit, the court is confronted with a contention by the maritime lienors, and by the trustee in bankruptcy, that the libel should be dismissed for the reason that the mortgage is not, and never was, a preferred mortgage within the meaning of the Ship Mortgage Act. The following statutes must be considered in this connection:

46 USCA § 251. *"Vessels of United States.* Vessels of twenty tons and upward, enrolled in pursuance of this chapter, and having a license in force, or vessels of less than twenty tons, which, although not enrolled, have a license in force, as required by this chapter, and no others, shall be deemed vessels of the United States entitled to the privileges of vessels employed·in the coasting trade or fisheries." R. S. § 4311.

46 USCA § 921. *"Sale, conveyance, or mortgage of vessel of United States; record.* (a) No sale, conveyance, or mortgage which, at the time such sale, conveyance, or mortgage is made, includes a vessel of the United States, or any portion thereof, as the whole or any part of the property sold, conveyed, or mortgaged shall be valid, in respect to such vessel, against any person other than the grantor or mortgagor, his heir or devisee, and a person having actual notice thereof, until such bill of sale, conveyance, or mortgage is recorded in the office of the collector of customs of the port of documentation of such vessel, as provided in subdivision (b) of this subsection.

"(b) Such collector of customs shall record bills of sale, conveyances, and mortgages, delivered to him, in the order of their reception, in books to be kept for that purpose and indexed to show—

"(1) The name of the vessel;

"(2) The names of the parties to the sale, conveyance, or mortgage;

"(3) The time and date of reception of the instrument;

"(4) The interest in the vessel so sold, conveyed, or mortgaged; and

"(5) The amount and date of maturity of the mortgage." 41 Stat. 1000.

46 USCA § 922. *"Preferred mortgages.* (a) A valid mortgage which, at the time it is made includes the whole of any vessel of the United States of 200 gross tons and upward, shall in addition have, in respect to such vessel and as of the date of the compliance with all the provisions of this subdivision, the preferred status given by the provisions of subsection M, section 953, if—

"(1) The mortgage is indorsed upon the vessel's documents in accordance with the provisions of this chapter;

"(2) The mortgage is recorded as provided in subsection C, section 921, together with the time and date when the mortgage is so indorsed;

"(3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any ·design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;

"(4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and

"(5) The mortgagee is a citizen of the United States.

"(b) Any mortgage which complies in respect to any vessel with the conditions enumerated in this subsection is hereafter in this chapter called a 'preferred mortgage' as to such vessel.

"(c) There shall be indorsed upon the documents of a vessel covered by a preferred mortgage—

"(1) The names of the mortgagor and mortgagee;

"(2) The time and date the indorsement is made;

"(3) The amount and date of maturity of the mortgage; and

"(4) Any amount required to be indorsed by the provisions of subdivision (e) or (f) of this subsection.

"(d) Such indorsement shall be made (1) by the collector of customs of the port of documentation of the mortgaged vessel, or (2) by the collector of customs of any port in which the vessel is found, if such collector is directed to make the indorsement by the collector of customs of ·the port of documentation; and no clearance shall be issued to the vessel until such indorsement is made. The collector of customs of the port of documentation shall give such direction by.wire or letter at the request of the mortgagee and upon the tender of the cost of communication of such direction. Whenever any new document is issued for the vessel, such indorsement shall be transferred to and indorsed upon the new document by the collector of customs.

"(e) A mortgage which includes property other than a vessel shall not be held a preferred mortgage unless the mortgage provides for the separate discharge of such property by the payment of a specified portion of the mortgage indebtedness. If a preferred mortgage so provides for the separate discharge, the amount of the portion of such payment shall be indorsed upon the documents of the vessel.

"(f) If a preferred mortgage includes more than one vessel and provides for the separate discharge of each vessel by the payment of a portion of the mortgage indebtedness, the amount of such portion of such pay-

ment shall be indorsed upon the documents of the vessel. In case such mortgage does not provide for the separate discharge of a vessel and the vessel is to be sold upon the order of a district court of the United States in a suit in rem in admiralty, the court shall determine the portion of the mortgage indebtedness increased by 20 percentum (1) which, in the opinion of the court, the approximate value of the vessel bears to the approximate value of all the vessels covered by the mortgage, and (2) upon the payment of which the vessel shall be discharged from the mortgage." 41 Stat. 1000.

It is insisted that there was a failure to comply with the statutory requirements in that (a) the vessels in question were not "vessels of the United States" at the time the mortgage was made; (b) the mortgage was not recorded as required by the Ship Mortgage Act; (c) the mortgage sued upon is fatally defective in form in that it failed to "recite at length" the new certificates of documentation.

■ The cases cited in support of the first of these contentions sustain the general proposition that a mortgage upon a ship, not properly documented, and therefore incapable of being denominated a "vessel of the United States," may not be accorded a preferred status. The recordation of any such mortgage will not give constructive notice of its existence. In re Empire Shipbuilding Co., 221 F. 223 (C. C. A. 2d); The Lincoln Land (D. C.) 295 F. 358; The Susana (C. C. A.) 2 F.(2d) 410; The Underwriter (C. C. A.) 3 F.(2d) 483. Upon this hypothesis argument is made that, inasmuch as the mortgage in suit was executed and delivered a few hours before the four vessels were documented in the ownership of Hudson River Navigation Corporation, in the office of the collector of customs in New York, as vessels of the United States, and because such documentation did not take place until twenty-five minutes after the mortgage was recorded in the customs house, the mortgage is not entitled to preferred status. An examination of the cases last above cited, however, discloses that the factual situations there before the courts were quite different from that here presented. In The Underwriter, The Susana, and The Lincoln Land, the vessels in question were registered or enrolled in the wrong port at the time the mortgage was made, and never were subsequently documented in the proper port. In the Empire Shipbuilding Case, a mortgage was given upon a vessel that was still in process of construction, and this fact appeared upon the face of the mortgage. The vessel was not enrolled, and the mortgage was not recorded until over two months after its execution. The mortgage was held to be one which merely covered personal property; the construction of the vessel not being sufficiently close to completion to permit of the issuance of a certificate of enrollment. The language in the opinions, to the effect that a ship covered by a mortgage must be a "vessel of the United States" *at the time of the making of the mortgage,* must be considered in the light of the facts under review. When this is done, it is apparent that the mortgages there in controversy were not invalidated as preferred liens due to the circumstance and incident that, in attempting to comply with the statute, some attorney or clerk failed to file and record his documents in proper order and sequence. An invalidation of a preferred ship mortgage, otherwise sufficient, for any such reason, would contravene the avowed purpose of the Ship Mortgage Act to furnish protection to persons loaning money on the security of such mortgages. See Hearings before the Committee on the Merchant Marine and Fisheries of the House of Representatives, Aug. 27, 1919, on H. R. 8422, Sept. 11, 1919 on H. R. 8873. That the Congress did not intend the precise moment of documentation to be of particular significance is apparent from the fact that there is no statute which requires the hour and minute of documentation to be recorded, although a notation of such time is required with respect to the recording of mortgages and the indorsement of mortgages upon ships' documents. 46 USCA §§ 921, 922.

Under the facts of this case, it is my belief that the events of May 5, 1926, should be treated as having taken place simultaneously. This is in accordance with the general rule that acts done during a day are presumed to have been done at the same time. See 62 C. J. 978. To hold otherwise would be an abject surrender to form and an unholy disregard of substance.

So far as concerns the objection thus far considered, therefore, I shall hold that the documentation which the steamships Fort Orange, Berkshire, Trojan, and Rensselaer received upon May 5, 1926, made them "vessels of the United States," and also that they were such at the time of the execution and delivery of the mortgage.

■ Further argument is advanced that the boats were not "vessels of the United States" because of alleged defects in the form of their documentation when owned by the Hudson

Navigation Company. It is said that at the moment at which the mortgage was made the outstanding documentation of the boats was faulty. The details of such faults need not be set forth. It is enough to say that title to the vessels passed to the mortgagor corporation prior to the making of the mortgage. Upon the admission of the maritime lienors, the sale of the steamers to the new owner had the effect of "undocumenting" the vessels. If this be true, the defects in their previous documentation, if such existed, would appear to be of only academic interest. Whether the steamers were "vessels of the United States" when mortgaged to libelant would depend upon the documentation they received in the hands of their new owner. The provision of section 30, subsection B (4), of the Ship Mortgage Act (46 USCA § 911 (4), to the effect that any vessel documented under the laws of the United States, "shall be held to continue to be so documented until its documents are surrendered with the approval of the board," must be construed in connection with subsection O (a), 46 USCA § 961 (a), which limits the application of section 911 (b) to the case of the conveyance of a vessel which at that time is covered by a preferred mortgage. The Lincoln Land, supra, The Susana, supra. See Burnham, Vessel Documenting and Conveyancing Law, 1925 A. M. C. 1, at pages 25, 26. None of the vessels here in suit was previously covered by a preferred mortgage, and each of them, upon the transfer to the mortgagor was registered anew as required by section 4170 of the Revised Statutes. 46 USCA § 39. Hence I believe any prior defects in documentation may be disregarded.

But objection is made to the documentation that was had under the statute just mentioned. It is said that such documentation was in the name of the Hudson River Navigation Corporation instead of in the name of its president or secretary, and also that the documentation was issued in the absence of an instrument, bearing the corporate seal of the new owner, which authorized the person who took the oath of ownership so to act, and further that the documentation was had before the Commissioner of Navigation, as required by the Home Port Act of 1925 (46 USCA §§ 18, 1011–1014), had given his approval to the designation of New York as the home port of the vessels. The first of these objections is founded upon the statute now quoted:

"Enrollments and licenses for vessels owned by any incorporated company *may* be issued in the name of the president or secretary of such company; and such enrollments or licenses shall not be vacated or affected by any sale of shares of stock in such company." (Italics mine.) R. S. § 4313, 46 USCA § 253.

"Previous to granting enrollment and license for any vessel owned by any incorporated company * * * the president or secretary of such company, or any other officer or agent thereof, duly authorized by said company in writing, attested by the corporate seal thereof, to act in its behalf, * * * shall swear to the ownership of such vessel without designating the names of the persons composing such company * * * which oath shall be deemed sufficient without requiring the oath of any other person interested or concerned in such vessel." R. S. § 4314, 46 USCA § 254.

The maritime lienors insist that the foregoing provisions make it imperative that a vessel be enrolled in the name of the president or secretary of the corporate owner, and not in the name of the corporation itself. No cases are cited in support of such construction. The brief of the trustee in bankruptcy concedes that the word "may," in Rev. St. § 4313 (46 USCA § 253), is permissive and not mandatory. Not only is this the reasonable interpretation of the word as used in the statute, but such is the judicial interpretation placed upon it by the lone decision that seems to have construed it. See Moore v. Lincoln Park, etc., Co., 196 Pa. 519, 529, 46 A. 857. The correctness of this interpretation is negatively confirmed by the fact that there is nothing in the statute which prohibits documentation in the name of a corporate owner, and by the requirement of Rev. St. § 4314, 46 USCA § 254, that the ownership of a vessel, when it resides in an incorporated company, shall be supported by the oath of a duly authorized officer or agent thereof, as well as when the vessel is owned by an individual. Furthermore, although as originally enacted (see 4 Stat. 129), this section provided that the oath of ownership should be made only by the president or secretary of the company, the Act of June 24, 1902, c. 1155, section 2 (32 Stat. 399, 46 USCA § 254) authorized "any other officer or agent thereof" to make the necessary oath. When such "other officer" subscribes the oath, he cannot truthfully swear himself to be the owner of the vessel for which he acts. Nor can he swear that the president or secretary is the owner. Clearly, in the case of the corporate ownership of a vessel, the statute contemplates that her en-

rollment can be in the name of the corporation.

■ The objection that the enrollment was defective because there was no instrument under corporate seal authorizing the president of the corporation to take the oath of ownership is without merit. There was no such requirement in section 254 as it was originally enacted, and the words, "duly authorized by said company in writing, attested by the corporate seal thereof, to act in its behalf," apply only to the words, "other officer or agent thereof," which were also added by the amendment of 1902. This is plainly inferable from the structure of the statute itself. It is made manifest by the desirability, if not necessity, of establishing the authority of an agent of the corporation other than its president or secretary, to act upon its behalf.

■ The argument of the maritime lienors that the mortgage was improperly filed in New York is likewise without foundation. The Home Port Act of February 16, 1925, c. 235, § 2, 46 USCA § 1012, provides: *"Record at home port.* No bill of sale, conveyance, mortgage, assignment of mortgage, or hypothecation (except bottomry), which includes a vessel of the United States or any portion thereof shall be valid in respect to such vessel against any person other than the grantor or mortgagor, his heirs or devisees, and any person having actual notice thereof, until such bill of sale, conveyance, mortgage, assignment of mortgage, or hypothecation is recorded in the office of the collector of customs at the home port of such vessel. Any bill of sale or conveyance of the whole or any part of a vessel shall be recorded at the home port of such vessel as shown in her new document. (Feb. 16, 1925, c. 235, § 2, 43 Stat. 948.)"

Section 1 of this Act, 46 USCA § 18, states that "every vessel of the United States shall have a 'home port' in the United States, * * * which port the owner of such vessel, subject to the approval of the Commissioner of Navigation of the Department of Commerce, shall specifically fix and determine. * * *"

In the instant suit, the bill of sale and mortgage were recorded in the office of the collector of customs of New York, and the vessels were licensed and enrolled, on May 5, 1926. However, the letter from the Commissioner of Navigation, approving the selection of New York as the "home port" of the vessels, was not filed until three days later. The lienors contend that the statute makes the approval of the Commissioner a strict condition precedent to the effective designation of a "home port." For this reason, it is said, the recordation of the bill of sale and mortgage in New York on May 5th was improper, inasmuch as the vessels were without a home port for three days thereafter. To this contention I cannot give assent. Any such interpretation of the statute is too narrow. A more reasonable view of the law is that it permits the owner of a vessel to choose her home port, and that prima facie the choice so made shall control. Such choice, however, is subject to the approval of the Commissioner. When it is remembered that the purpose of the Home Port Act was to simplify the previous technical difficulties surrounding the determination of the proper place in which to record conveyances, it becomes apparent that the statute was not intended to introduce new technicalities. The approval of the Commissioner is in the nature of a condition subsequent, and the recordation of the vessel's papers in New York was valid when made, subject to be invalidated only if the Commissioner should fail to give his approval. In this case, the Commissioner had orally approved the choice of a home port for the vessels prior to recordation of the papers. His written approval was forthcoming within three days thereafter. In my opinion, the propriety of the documentation of the vessels and the recordation of the bill of sale and the mortgage in New York on May 5, 1926, is not to be doubted.

■ The lienors further say that the mortgage sued upon is fatally defective in that it failed to "recite at length" the new certificates of documentation, as required by Rev. St. § 4170, 46 USCA § 39. That section reads, in part: "Whenever any vessel, which has been registered, is, in whole or in part, sold or transferred to a citizen of the United States * * * the vessel shall be registered anew, * * * otherwise she shall cease to be deemed a vessel of the United States. * * * In every such case of sale or transfer, there shall be some instrument of writing, in the nature of a bill of sale, which shall *recite, at length,* the certificate (of registry); otherwise the vessel shall be incapable of being so registered anew." (Italics mine.)

It is plain from the context of this statute that the words "sale or transfer" were not intended to include a mortgage. A construction to such effect would make it necessary to register a vessel anew every time it became the subject of a mortgage. The obvious purpose of the registry laws in this regard is to require a new documentation only when there

is a change in the vessel's ownership. Consistent with this purpose, section 30, subdivision D (c), of the Ship Mortgage Act, 46 US CA § 922 (c), requires that the documents of a vessel shall be indorsed with certain facts concerning any preferred mortgage she may carry, but there is nothing in the section which necessitates that a vessel shall have new documents when she is mortgaged. The case of Mitchell v. Taylor, 32 Me. 434, 437, 438, relied upon by the lienors, is not authority for an interpretation to the contrary. There the plaintiff attempted to prove that he had title by default under the mortgage without bringing a suit to foreclose and without receiving a bill of sale. The court held that such acquisition, in view of the statutory requirement of a bill of sale reciting the vessel's document, was not sufficient to permit redocumentation. The opinion of the court does not hold a mortgage to be a "transfer" within the meaning of the statute, but decides that the mortgage then before the court in which there was no recital of the vessel's document could not be deemed sufficient to take the place of the "instrument of writing, in the nature of a bill of sale," required by the statute. In other words, the mortgage was not invalid for failure to contain the recital, but it was, under the statute, incapable of serving the purposes of a bill of sale.

Believing, for the reasons I have specified, that the objections raised by the maritime lienors should be overruled, I am prepared to hold the mortgage in suit to be a preferred ship mortgage upon the vessels under the provisions of the Ship Mortgage Act 1920, and also that it can be foreclosed in the admiralty of this court. The lien of the mortgage, of course, takes precedence over the liens of the maritime lienors. Ship Mortgage Act 1920, c. 250, § 30, subsec. M, 46 USCA § 953.

The priority of the mortgage lien also extends to income received from the operation of the mortgaged vessels during the period that Irving Trust Company, as receiver in admiralty, has been in possession of the steamers. The lien was expressly intended to attach to the "tolls, rents, revenues, incomes, issues, earnings and profits" of the mortgaged property in the event of a default, and article 5, section 5, of the indenture, provides: "In case, upon the happening and continuance of any of the events of default aforesaid, the trustee shall proceed 'by a suit in equity or in admiralty, or by action at law, the Trustee shall be entitled, pending any such suit or action, as a matter of right, to the appoint-

ment of a receiver of the trust estate, and of the tolls, earnings, revenues, rents, issues, profits and income thereof."

Where a mortgage covers income arising from mortgaged property as is the fact here, the law is that the mortgagee or mortgage trustee is entitled to such income from the date upon which the receiver appointed in the foreclosure suit takes possession of the property producing the income. Freedman's Savings & Trust Co. v. Shepherd, 127 U. S. 494, 8 S. Ct. 1250, 32 L. Ed. 163; In re Brose, 254 F. 664 (C. C. A. 2d); Pintsch Compressing Co. v. Buffalo Gas Co., 280 F. 830 (C. C. A. 2d); Sullivan v. Rosson, 223 N. Y. 217, 119 N. E. 405, 4 A. L. R. 1400. Therefore, even if the maritime lienors acquired a lien upon the income from the vessels, as well as upon the vessels themselves, the lien of the mortgage trustee, acquired by virtue of the preferred ship mortgage, would be paramount as to all earnings received after the admiralty receiver took possession. Since it does not appear from the present record that any income was earned by the vessels during the prior five months in which they had been in the possession of the marshal under the libels of the maritime lienors, it is not necessary at this time to determine whether or not their liens extend to the vessels' earnings. If the maritime lienors make a showing that the vessels did earn income during that period, however, they will be afforded a further opportunity to press their contention in this regard.

Returning to the equity suit, it is found to be under lively attack by the trustee in bankruptcy. Inasmuch as a number of the matters here raised have been finally determined by the interim decree, in which the trustee in bankruptcy acquiesced upon his intervention in the suit, they need not be discussed. For example, the contention that the whole mortgage is fraudulent in law and void cannot now be considered. The court has previously held it to be a valid and subsisting lien upon a large part of the property covered by its terms. For the same reason, the trustee in bankruptcy cannot now dispute the validity of the lien upon the so-called Albany leases. See interim decree, article V. Only such questions as were left open by the interim decree can receive attention.

The first of these is whether the lien of the mortgage covers such moveable property upon the premises leased from the city of Albany as was acquired by the mortgagor subsequent to the date of execution and delivery of the indenture. In terms, that instrument purports to cover the entire inter-

est of the mortgagor in the Albany leases "together with all the right, title and interest of the Company of every kind and nature in and to machinery, engines, appliances, tackle, sheds, pier and dock equipment, and other property situated upon, or used or useful in connection with the property described in the leases mentioned in this Parcel No. 3, *whether the same is now owned or shall be hereafter acquired by the Company*" (italics mine); and "all the right, title and interest of the Company of every name and nature in and to all office furniture, safes, desks, office supplies, office equipment, trucks and tools, *whether now owned or hereafter acquired,* situate and being upon the property described in Parcels Nos. 1, 2 and 3, or any portion thereof" (italics mine).

Article 6, section 2, of the mortgage, provides: "The Company shall, in the ordinary course of business, be entitled to use and consume fuel, supplies and materials, * * * and to pull down, alter and repair buildings and structures * * * *and to replace any of its equipment, machinery, tools and furniture* without any obligation on the part of any purchaser to inquire into the authorization or regularity of the sale thereof or to see to the application of any purchase price." (Italics mine.)

Whether, and to what extent, a clause in a mortgage covering after-acquired personal property is valid is a local question, and depends upon the law of the state in which the property is situated. Thompson v. Fairbanks, 196 U. S. 516, 25 S. Ct. 306, 49 L. Ed. 577; In re Marine Construction & Dry Dock Company, 144 F. 649 (C. C. A. 2d). The question has been answered differently in different jurisdictions, but, within this state, the general rule is that such clause will not be enforced against the mortgagor's trustee in bankruptcy. Titusville Iron Co. v. City of New York, 207 N. Y. 203, 100 N. E. 806; Zartman v. First National Bank, 189 N. Y. 267, 82 N. E. 127, 12 L. R. A. (N. S.) 1083; cf. Rochester Distilling Co. v. Rasey, 142 N. Y. 570, 37 N. E. 632, 40 Am. St. Rep. 635. The theory is that such a clause does not create a present lien, but is to be regarded merely as a covenant to give a lien. The agreement so to do may be specifically enforced in equity when the property comes into the possession of the mortgagor. See Guaranty Trust Company v. N. Y. & Q. C. R. Co., 253 N. Y. 190, at page 199, 170 N. E. 887; Kribbs v. Alford, 120 N. Y. 519, 24 N. E. 811. But, upon the intervention of other equities, a court of equity will not specifically enforce the covenants. The rights of general creditors or of a trustee in bankruptcy constitute such intervening interests. Titusville Iron Company v. City of New York, supra; Zartman v. First National Bank, supra. It follows that the rights of the trustee in bankruptcy in the moveable property on the premises leased from the city of Albany, and which was acquired by the mortgagor subsequent to the delivery of the mortgage, are superior to those of the mortgage trustee. The exceptional cases in which the mortgagee has been held to prevail over general creditors have all involved railroad mortgages, to which different considerations of public policy are applicable. Pierce v. Emery, 32 N. H. 484; Platt v. N. Y. & Sea Beach Railway Co., 9 App. Div. 87, 41 N. Y. S. 42, affirmed 153 N. Y. 670, 48 N. E. 1106. See Williston, Transfers of After-Acquired Personal Property, 19 Harvard Law Review, 557, 580; Glenn, Creditors' Rights and Remedies, §§ 274, 275.

The specific chattels in the nature of machinery and equipment used in connection with the Albany leaseholds and which were acquired subsequent to the delivery of the mortgage, are not clearly identified by the proof. This is also true with respect to after-acquired office furniture and equipment located at Kingston and upon Pier 32. The burden of establishing the ownership of the mortgagor in and to the property claimed to be covered by the lien rests upon the mortgagee. There is, nevertheless, a presumption that all property within the description contained in the mortgage, and which is in the possession of the mortgagor upon the appointment of a receiver, belonged to the mortgagor at the time of the execution and delivery of the mortgage. Cunningham v. Sizer Steel Corporation (D. C.) 1 F.(2d) 337. Cf. New York Security & Trust Co. v. Saratoga Gas & Electric Company, 88 Hun, 569, 34 N. Y. S. 890, affirmed 157 N. Y. 689, 51 N. E. 1092. While the present mortgagee is entitled to the benefit of this presumption, it has been overthrown, in part at least, by evidence produced by the trustee in bankruptcy which shows that moveable property costing approximately $56,000, was acquired by the mortgagor subsequent to the making and delivery of the mortgage. See Wigmore on Evidence (2d Ed.) §§ 2480, 2491. The mortgage trustee having rested upon the presumption that all chattels coming into the hands of the receiver were covered by the mortgage, an account must be taken as to the property acquired as a result of the expenditures made by the mortgagor between the delivery date of

the mortgage and the date of the receivership. The decision in the case of In re F. & D. Co. (C. C. A.) 256 F. 73, upon which the mortgage trustee argues that it is entitled to all the moveable property, because of its inextricable confusion and commingling, is not controlling here. In that litigation there was no evidence to show that any after-acquired property had been placed upon the premises. Furthermore, all the property had been sold for a lump sum, thus rendering impossible a segregation of the proceeds arising from mortgaged and unmortgaged property. No such situation is presently before the court. As a result, upon a reference or otherwise, the mortgagee and the trustee in bankruptcy will be afforded an opportunity to identify the chattels to which they are respectively entitled.

 The next question before me relates to certain mortgage bonds of the par value of $78,000, and is raised by a committee of bondholders which has excepted to some actions of the mortgage trustee in the execution of its obligations. Decision of this matter was expressly reserved by article X of the interim decree. In passing, note may be taken that the bondholders' committee is not a formal party to the present suit. It made an oral motion of intervention which, upon the opposition of the mortgage trustee, was not pressed. The committee, however, has briefed its present objection, and since, indirectly, it has some bearing upon a contention of the trustee in bankruptcy, I think a statement of my views is warranted.

The essential facts giving rise to the question are these:

While the condemnation proceedings in relation to Pier 32 were in progress in the state court, certain persons connected with the mortgagor corporation, and particularly its president, conceived the idea of purchasing some of the outstanding mortgage bonds, which were then obtainable at prices considerably below par. On May 9, 1931, City Bank Farmers' Trust Company, in its individual capacity, agreed to purchase as many of the bonds as might be bought for the sum of $60,000. Hudson River Navigation Corporation covenanted that upon September 15, 1931, it would take over the bonds so to be purchased at their cost plus 1 per cent. Performance of this stipulation was personally guaranteed by Edward C. Carrington, president of the mortgagor. Thereupon City Bank Farmers' Trust Company proceeded to purchase bonds of the par value of $73,000. By an agreement of September 21, 1931, the obligation of the corporation to take up the bonds was extended to September 15, 1932; Carrington again guaranteeing performance. On November 1, 1931, the corporation defaulted in the payment of interest falling due on that day upon the whole of the outstanding bond issue. On November 30, 1931, and within one day of the expiration of the period of grace within which the default of November 1 might be cured, the mortgagor transferred the sum of $5,000, together with bonds of the par value of $5,000, to City Bank Farmers' Trust Company as security for the performance of its engagement to take up the bonds purchased under the aforesaid agreements.

The transaction just outlined is under attack by the committee of bondholders on the ground that some of the purchases made by City Bank Farmers' Trust Company were from Carrington, acting as an individual, and were at higher prices than need have been paid to other persons, and for the further reason that the trust company was profiting upon the deal. It is also claimed that the bonds should be treated as having been extinguished. The trustee in bankruptcy takes the position that the mortgagor's transfer of funds and securities to the trust company by way of security, constituted a voidable preference under the bankruptcy statute, the mortgagor having become bankrupt in less than four months thereafter.

Dealing, first, with the contention made by the committee of bondholders, and limiting the discussion to the bonds having a par value of $73,000 which the trust company had acquired prior to November 30, 1931, it is to be said that the arguments designed to prevent their participation in any distribution to be made to bondholders are not convincing. While Carrington's course of dealings in the transaction can have no stamp of approval at my hands, and although, in my judgment, the trust company might well have viewed the matter with a much more quizzical eye, a provision of the mortgage itself would seem to foreclose the stand of the committee. Article 9, section 1 (7), of that instrument, is as follows: "The Trustee in its individual capacity may acquire bonds with the same rights which it would have if it were not the trustee hereunder."

Thus it would appear the trust company, however dubious may have been the propriety of vesting it with authority to act in a dual capacity, was within its rights in buying bonds for its individual account. In addition, the letters setting forth the agreements between the mortgagor and the trust compa-

ny plainly indicate the transaction to have been one of purchase and resale of the bonds, and not one in which the trust company was acting as an agent for the mortgagor. The bonds, therefore, did not suffer extinguishment upon the theory that they were repurchased for purposes of retirement.

Taking up now the argument with respect to the transfer which the trustee assails as being preferential, one must remember that the burden of proving each element of a preferential transfer rests upon him who alleges it. Pyle v. Texas Transport & Terminal Company, 238 U. S. 90, 35 S. Ct. 667, 59 L. Ed. 1215; Liberty National Bank v. Bear, 265 U. S. 365, 44 S. Ct. 499, 68 L. Ed. 1057. One of such elements is that the debtor must, in fact, have been insolvent at the time of the transfer. Bankruptcy Act § 60a, 11 USCA § 96 (a); Remington on Bankruptcy (3d Ed.) § 1738. There is here, it is true, no specific proof that the mortgagor was bankrupt at the moment of transfer. Within two months thereafter, however, the corporation itself filed a petition in bankruptcy. This proceeding was set aside, but it was followed speedily by an adjudication which showed the condition of the company to be one of insolvency. The financial situation of the mortgagor, then existing, was not materially different from that which burdened the corporation upon the date of the transfer. This leads to an inquiry as to the notice, if any, of the corporation's financial difficulties that was open to the trust company when the transfer was requested and received.

The evidence shows that Mr. Bradford, a vice president of the trust company, had investigated the condition of the company. Among other things, the following items came to the attention of the trust company prior to its receipt of the alleged preferential transfer:

(1) That fixed charges had not been earned for several years.

(2) That the company was operating at an actual net loss.

(3) That money was being borrowed in order to pay interest upon the mortgage bonds.

(4) That there was an outstanding bank indebtedness of $300,000.

(5) That the fleet of the corporation was unliquid (and also that the vessels were antiquated).

(6) That the company had defaulted in the payment of interest on the bond issue that fell due on November 1. (Inquiry would have shown that there was no hope or expectation of meeting the payment before the expiration of the period of grace.)

(7) That the balance sheet of the mortgagor as of December 30, 1931, showed the floating equipment of the company to be carried at a value of $2,980,956.63, which valuation, as the trust company from its acquaintance with the history of the line must have shown, was grossly excessive. The balance sheet also listed the terminal property owned by the mortgagor as having a value of $2,-599,764.20. At the time of the transfer, the award made for the condemnation of Pier 32 was $2,000,000, and the release value of the Kingston property was but $10,000.

(8) That the corporation's business of transportation, for the time being at least, was at a practical standstill.

In the face of all these items of notice, the trust company must be charged with knowledge of what even a superficial inquiry would have disclosed, viz. that the mortgagor was insolvent.

That the proof of such state of affairs, although principally deduced from the bankruptcy itself, is here sufficient, is supported by In re Dix (D. C.) 267 F. 1016; In re Elmira Steel Company (D. C.) 109 F. 456. See, also, Pender v. Chatham Phenix National Bank & Trust Co. (C. C. A.) 58 F.(2d) 968.

Having concluded the transfer under discussion to have been preferential in character, the argument of the trust company that it had a right to set off the value of the transfer against the outstanding obligation of the mortgagor remains for disposition. In this also the decision must go to the trustee in bankruptcy. The indebtedness against which the set-off is claimed had not matured. This is enough, I think, to defeat the claim of set-off. First National Bank v. Anglo-Oesterreichische Bank (C. C. A.) 37 F.(2d) 564; Fifth National Bank v. Lyttle (C. C. A.) 250 F. 361; Pender v. Chatham Phenix National Bank & Trust Co., supra.

Finally, determination must be made as to whether $120,155.72 out of the sum of $230,000 held by the trust company in a segregated account, belongs to the trustee in bankruptcy. The facts out of which this immediate controversy grows follow:

A final decree in the condemnation proceedings on Pier 32 was made on July 21, 1931. The parties to the proceedings had taken cross-appeals from the award made by the Supreme Court of the state. During their pendency, and upon December 1, 1931, the

corporation counsel of the city of New York and the attorneys for the mortgage trustee and for the mortgagor, respectively, entered into a stipulation which provided for a settlement of the condemnation suit by the reduction of the award from $2,000,000 to $1,850,000, plus accrued interest. In January, 1932, Gibboney, Johnston & Flynn, Esqs., who, under a contingent arrangement, represented the Hudson Navigation Corporation in the condemnation proceedings, undertook to compel the city of New York to pay the award, against which they had filed a lien. The mortgage trustee also asked that the award be paid. This action resulted in an order by the Supreme Court, New York county, which directed that the city pay to the mortgage trustee the amount of the award and accrued interest, less deduction of $108,625.75, to be paid for wharfage and pier rentals due the city, and the further sum of $11,529.97, which was owing the city by Hudson Navigation Corporation upon account of taxes. The order likewise directed that out of the net amount payable to the mortgage trustee the sum of $230,000 should be held by it in connection with the pending proceedings, in which the lien of Gibboney, Johnston & Flynn was to be fixed. Meanwhile, the determination of the lien was referred to a referee.

The account with the city was computed as follows:

Principal of award as fixed by
 stipulation ................$1,850,000.
Interest from May 8, 1930 to
 March 21, 1932 ............. 207,707.
 _____
 Total ..................$2,057,707.

As has been seen, the order of the Supreme Court directed that a total of $120,155.72 be paid to the city for wharfage, pier rental, and taxes. Therefore the mortgage trustee actually received $1,937,551.28, out of which it was required to set aside $230,000 to cover the claims of all possible claimants, including the attorneys Gibboney, Johnston & Flynn.

The trustee in bankruptcy wishes to have an adjudication that the sum of $120,155.72 is included in the attorney's lien fund; it being urged that not alone is he not bound by the stipulation but that such agreement never was performed. In other words, the contention is that the interest on the principal of the award belonged to the mortgagor, unincumbered by the mortgage lien, and that the deduction of $120,155.72 should have been made from the principal sum and not from

the accumulated interest thereon. The mortgage trustee now denies that the interest was free from the lien of the mortgage, although at one stage of the transaction it indulged a contrary view. It also insists that, in any event, the stipulation, as well as the action taken thereunder, is binding upon the mortgagor and the trustee in bankruptcy. Paragraph fifth of the stipulation provided: "It is further agreed between the parties that the City of New York may make two warrants in payment of the award herein; one warrant payable to the order of the trustee in full amount of principal the other warrant shall be for interest, and out of the amount payable for interest, the City of New York may deduct the amount due it for rental of Pier 32, and Pier 52."

From this language it is not clear whether it was intended that the interest embodied in the second warrant should be regarded as the unincumbered property of the mortgagor. Such, however, appears to be the interpretation placed upon the agreement by the parties who signed it. See findings of fact 45, 49, 52, and 63, and conclusions of law Nos. 5 and 9, in the report of the referee upon petition of Gibboney, Johnston & Flynn. See, also, article twenty-ninth of the original bill of complaint herein. This interpretation accords with the general rule of law relating to this subject-matter, viz. that the mortgagor may have rents and profits of mortgaged premises until possession of the mortgaged property comes into the hands of a receiver at the instance of the mortgagee in a foreclosure suit. See Freedmans Savings & Trust Co. v. Shepherd, supra; In re Brose, supra; Sullivan v. Rosson, supra. There is no cause to depart from this rule. As between the mortgagor and the mortgagee, the condemnation award was covered by the lien of the mortgage, but the interest thereon stands in the place of profits and income derived from the mortgaged premises, and is not so covered.

So far as I can see, the right of the mortgagor to treat the interest as it did, and to consent to its utilization in the payment of lawful charges due the city, is not open to just attack. Neither do I believe that the circumstance that Gibboney, Johnston & Flynn represented the mortgage trustee, as well as the mortgagor, in certain stages of the condemnation proceedings, changes the complexion of the transaction. But, beyond all this, it was eminently proper that the charges of the city should have been deducted from the interest accumulation, and not from the principal of the award. The obligation to pay

848

wharfage, rent, and taxes belonged to the mortgagor, and not to the mortgagee. The mortgagor had covenanted to discharge such obligations. The settlement with the city was not carried into effect until the bankruptcy of the mortgage had come about, and the city had a right to set off the amount of its charges and liens against any sum payable to the mortgagor. See section 68 of the Bankruptcy Act (11 USCA § 108). In view of what has been said, the trustee in bankruptcy will not be permitted to prevail, upon the contention he has made concerning deductions from the interest accumulation.

Let decrees carrying out the decisions herein made be submitted.